## PATRIOTIC INS. CO. OF AMERICA v. FRANCISCUS.

### No. 9170.

Circuit Court of Appeals, Eighth Circuit.
Jan. 23, 1932.

George C. Willson, of St. Louis, Mo. (J. H. Cunningham, Jr., and Taylor, Chasnoff & Willson, all of St. Louis, Mo., on the brief), for appellant.

Everett Paul Griffin, of St. Louis, Mo. (Allen C. Orrick, Dwight D. Ingamells, and Nagel, Kirby & Shepley, all of St. Louis, Mo., on the brief), for appellee.

Before VAN VALKENBURGH, BOOTH, and GARDNER, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

Appellee, as surviving trustee under the will of Jane Lindsay, deceased, was the hold-

er of the legal title to a two-story brick building, with a connecting one-story brick building in the rear, located at 4432–34 Olive street in St. Louis, Mo. The buildings were insured in the total sum of $16,500, evidenced by several policies, that of appellant being for the sum of $3,500. May 31, 1927, the property was leased to Mark and Jean White, passing, August 20, 1928, by mesne assignments, with the consent of the lessor, to one Wells Alexander, who was the lessee and occupant of the premises thereafter, and on the 24th day of December, 1929.

Appellant's policy of fire insurance was issued February 19, 1929, and was to expire one year from that date. It was therefore in force December 24, 1929, on which date a fire occurred, resulting in the damages which are the subject-matter of this litigation. After the fire there was found in the basement a large concrete tank or vat, containing a large quantity of mash, copper coils, etc., forming component parts of an alcohol distilling plant. A sample of this mash was examined by the city chemist and found to contain 8.8 per cent. alcohol and 2 per cent. reducing sugar. The chemist testifies that this mash could have been distilled into alcohol, and "could have had no other purpose than to be run through a still and alcohol produced from it."

The premises insured are thus described in the policy: "The brick, stone, and iron (and additions) building, including foundations, plumbing, electric wiring and stationary heating, lighting, and ventilating apparatus and fixtures therein; also all permanent fixtures, stationary scales and elevators belonging to and constituting a part of said building, occupied as a garage and repair shop, situated at 4432–34 Olive Street in the City of St. Louis, State of Missouri."

It was a condition of the policy contract "that if there be other fire insurance upon the property covered, this company shall be liable only for such proportion of any direct loss or damage caused by fire or by lightning as the amount of this policy bears to the whole amount of fire insurance applying, whether such other insurance contains a similar clause or not"; also, that the entire policy should be void "if the hazard be increased by any means within the control or knowledge of the insured."

The suit upon the policy, originally brought in the circuit court of the city of St. Louis, was duly removed to the District Court for the Eastern District of Missouri. On trial appellee recovered the full amount of the policy in suit, as for a total loss of the buildings insured.

The errors urged and relied upon are the following:

1. The language of the policy describing the premises, as "occupied as a garage and repair shop," constitutes a continuing and absolute warranty, which was breached by the operation of an illicit alcohol still in the insured premises.

2. The breach of such warranty is fatal to the policy, although the assured had no knowledge of the matter constituting the breach.

3. A landlord is bound by acts of his tenant violative of the provisions of his policy. Whether the landlord had knowledge of such acts is immaterial.

4. The unlawful operation of the still in the insured premises was an increase of hazard by means within the control of the insured, where the lease provides that lessor or his personal representatives may at all reasonable hours enter upon said premises for the purpose of examining the condition thereof.

5. "Where a substantial portion of a building remains standing after a fire and is used, useful, and valuable in repairing the building, such building has not lost its identity and specific character as a building and cannot be said to be a total loss by fire."

6. "In a suit on a fire insurance policy the measure of damages to a building damaged by fire is the difference between the value of the building immediately before the fire, and the value of the building immediately after the fire; and not the amount expended in repairing the building."

7. "The action of the court in refusing defendant the right to further cross-examine plaintiff's expert witness, Daniel H. Kremer, relative to the value of the building immediately after the fire, irreparably prejudiced defendant's rights where said witness had made conflicting and confusing statements as to such value, and after a dispute had arisen between appellant's counsel and the court in the presence of the jury as to what said witness had stated about the matter."

8. Certain language of the court in reprimanding counsel for appellant in the presence of the jury.

9 and 10. Certain portions of the charge of the court.

11. "Ex parte written estimates of repair cost prepared by a contractor are not admissible in evidence for the purpose of sup-

porting and corroborating such witness' testimony in connection with the damages caused to the building by fire."

12. The court's action in overruling appellant's motion for judgment on the pleadings.

▉ The first three specifications may be considered together. Specification No. 1 is based upon the contention that the quoted language, "occupied as a garage and repair shop," constitutes an absolute warranty that the building should be so occupied and not otherwise, as a condition to the acceptance and continuance of the insurance risk. When such a warranty exists, it is fatal to the policy if breached, and the insured landlord is bound as stated in specifications 2 and 3. Connecticut Fire Ins. Co. v. Buchanan (C. C. A. 8) 141 F. 877, 881, 4 L. R. A. (N. S.) 758; Allen v. Home Insurance Co., 133 Cal. 29, 65 P. 138; Appleby v. Firemen's Fund Ins. Co., 45 Barb. (N. Y.) 454; Kelly v. Worcester Mutual Fire Ins. Co., 97 Mass. 284; Edwards v. Insurance Association, 128 Ga. 353, 57 S. E. 707, 12 L. R. A. (N. S.) 484, 119 Am. St. Rep. 385, 10 Ann. Cas. 1036; Wetherell v. City Fire Ins. Co., 16 Gray (82 Mass.) 276; Leonard v. Northwestern Nat. Ins. Co., 53 App. D. C. 343, 290 F. 318; Liverpool & London Ins. Co. v. Gunther, 116 U. S. 113, 6 S. Ct. 306, 29 L. Ed. 575; Imperial Fire Ins. Co. v. Coos County, 151 U. S. 452, 14 S. Ct. 379, 38 L. Ed. 231.

But such a result is based upon an express provision of the policy that it should become void upon putting the property to a prohibited use, or by introducing expressly prohibited articles, such as gasoline or other inflammable materials, which increase the hazard of fire. For example, in Connecticut Fire Insurance Co. v. Buchanan, first above cited, there were two policies in suit. One insured a building "as a 'normal school and dwelling' "; the other insured it, "occupied and only while occupied as a normal school and dwelling." Both policies contained the following declaration: "If the occupants should be changed, except change of occupants without increase of hazard, or if the use be changed, * * * it shall be held to be an election on the part of the insured to cancel said policy, and the said policy shall stand canceled."

It was further provided that the policy should be void if the building became vacant and unoccupied. The provision in the policy in suit is entirely different. The language used is a mere recital in connection with the description of the insured premises. There is contained no provision that the policy shall be void upon change of occupancy or use. The recital of present occupancy in this case is descriptive merely. We find in it no warranty such as urged by appellant, and no basis for the application of the rules invoked by specifications two and three.

The contention respecting increase of hazard flows from another provision of the policy, which leads to the consideration of specification of error No. 4.

▉ 4. It must be conceded that the operation of an alcohol still in the insured premises was an increase of hazard. Whether it was brought about "by means within the control or knowledge" of the assured is the question at issue. This precise language, and language of similar import, has been considered in text-books and digests, and by courts, state and federal, in a great many cases, and the overwhelming weight of authority is that the landlord is not an insurer against the introduction of increased hazard, but that his liability depends upon his knowledge, or upon circumstances which, by the exercise of ordinary care and diligence, would result in such knowledge. Joyce on Insurance (2d Ed.) vol. 4, § 2222; Couch Cyc. of Insurance Law, vol. 4, § 960c; 26 C. J. par. 239 and 268; Merrill v. Insurance Co. of North America (C. C.) 23 F. 245; Royal Exch. Assurance Co. v. Thrower (D. C. Ga.) 240 F. 811; Id. (C. C. A. 5) 246 F. 768; Hartford Fire Ins. Co. v. Morris (C. C. A. 6) 27 F. (2d) 508; Miller v. Union Assurance Soc. (C. C. A. 8) 39 F.(2d) 25; St. Paul Fire & Marine Ins. Co. v. Bachmann (C. C. A. 4) 49 F.(2d) 158; Bitonti v. National Liberty Ins. Co., 96 Pa. Super. Ct. 521; Mercantile Ins. Co. v. Union Stock Yards Co., 120 Ky. 465, 87 S. W. 285; Nebraska & I. Ins. Co. v. Christiensen, 29 Neb. 572, 45 N. W. 924, 26 Am. St. Rep. 407; Taverna et al. v. Palatine Ins. Co., 228 App. Div. 33, 238 N. Y. S. 389; Joslin et al. v. National Reserve Ins. Co., 201 Wis. 506, 230 N. W. 711; Schaffer v. Hampton Farmers' Mutual Fire Ins. Co., 183 Minn. 101, 235 N. W. 618, 236 N. W. 327; Fayle v. Camden Fire Ins. Ass'n, 85 Mont. 248, 278 P. 509; Colker v. Connecticut Fire Ins. Co., 218 Ky. 124, 290 S. W. 1073; Philadelphia Fire & Marine Ins. Co. v. English, 232 Ky. 785, 24 S.W.(2d) 616; Colker v. Connecticut Fire Ins. Co., 224 Ky. 837, 7 S.W.(2d) 502.

In the last case cited the Court of Appeals [224 Ky. 837, 7 S.W.(2d) 502, loc. cit. 505] held that the trial court should have given the following instruction as having application to

the facts in that case: "If the plaintiff had, in good faith, rented to James Martin the sheet and metal building and Martin had installed and operated the moonshine still therein, without the plaintiff's consent, and plaintiff did not know it and in the exercise of ordinary care, under the facts known to him, should not have known it, then same was not by means within his control. But if the plaintiff had not, in good faith, rented the building to James Martin, or if Martin installed and operated the moonshine still in it with plaintiff's consent, or he knew it or in the exercise of ordinary care under the facts known to him should have known it, then same was by means within plaintiff's control."

█ In the case before us, the evidence as to the existence and operation of the still upon the premises was substantially as follows: Witnesses Gieseler, Fuch, Nelson, and Keller, testified to seeing the vat of mash and parts of the still in place at various dates after the fire. Witness Jokerst, who lived at 4461 Olive, and had a place of business at 4424 Olive, about forty feet from the insured premises, testifies that he smelled the odor of mash coming from those premises from August 22, 1929, till the day of the fire. His testimony also connects the tenant Alexander with ownership of, or interest in, the still, by acts taking place after the fire. Dr. Darling, who lived at 4430 Olive street, adjoining premises, had smelled the odor of mash and of boiling prunes, but took no steps to find where the odor came from. This distilling plant was situated entirely in the basement. Witness Humphries, a contractor doing general building and repair work, visited the premises in the latter part of January, 1929. On his first visit he did not see the mash vat, although he was in the basement to inspect it for the purpose of making necessary repairs. He says: "I made a thorough inspection, but I did not see the vat there when made my examination. I went out there for the purpose of inspecting everything in the building, and after such inspection did not see the large concrete vat." Later his attention was called to it.

Hartenberger, fireman, testified that he did not smell the odor of mash at the time of the fire, but did at a later date. Seidal, the regular letter carrier, Collins, the policeman on the beat, and Chrisler, whose home is only about twenty-five feet from the alley door of the Alexander garage, all testified that they had never smelled the odor of mash in connection with the insured premises at any time. Allan Morgens, assistant manager of a cleaning and dyeing company, located directly across the alley to the south of the insured premises, testified to the same effect. He was in the habit of passing through the building at 4432–34 Olive street, prior to the fire, three or four times daily on his way to a street car line passing directly in front of the Alexander garage. He was familiar with the smell of mash, and detected no such odor in that building. Mr. Stemmerich, rent collector for the Franciscus Realty Company, made frequent visits to the premises to collect the rent. He testified that he saw and smelled nothing to arouse his suspicion. Mr. Franciscus testified that he had no knowledge of the illicit use of the premises, nor any information that would lead to such knowledge. During his examination, the following questions were asked and answers made:

"Q. That building was not under your control, was it? A. Well, it was in our charge. My office was in charge of the property. Collecting rents, paying taxes, and placing insurance. I did not have possession of the premises. I had leased it to Wells Alexander, who was in possession as lessee. Mr. Stemmerich, our collector, collected the rents by personal call 3 or 4 times a month."

As has been said, the illicit plant was in the basement. On the first floor the business of a garage and repair shop was carried on in the usual manner. From the foregoing evidence before the court, the question of whether increase of hazard was "by any means within the control or knowledge of the insured" was proper to be submitted to the jury. It was submitted in the following language:

"I have said to you that, as a matter of law, the setting up and operating upon the premises by Wells Alexander, of an alcohol still, or what is sometimes called a moonshine still, or whisky still, was an increase of hazard, and that, other things being equal, would render this policy void and of no effect, and plaintiff could not recover. But there is another condition there, and that condition is that this thing must be done, this increase of hazard must be made, within the knowledge or control of the insured. Before you can declare this policy void, then, on the ground that there was a still put in there and operated in there, you must go further and find that this was done, either within the knowledge or within the control of Mr. Franciscus; that he had knowledge of it, or that it was within his power to have, under the circumstances, controlled it, prevented it, or stopped it.

"Now, to get down to that: A thing of this sort, an increase of hazard of this sort, is in the knowledge and control of the insured under certain circumstances, and it is beyond, or not within the knowledge or control, under certain other circumstances. If you find that plaintiff did in good faith rent this building to Wells Alexander, that is, if he rented it without any collusion; rented it as an automobile garage, automobile repair shop, or automobile paint shop, and for no other purpose, and there was nothing underhand existing between these two, then, of course, it was done in good faith; and there is no evidence whatever in this case that there was any sort of collusive agreement between the two, that is, no oral evidence, no evidence whatever from the witness-stand. If, thereafter, Alexander installed and operated a moonshine still therein, if you find there was any, without the plaintiff's consent, and if plaintiff did not know it, and in the exercise of ordinary care should not have known it, then the situation and the existence of the mash and still were not within plaintiff's knowledge or control. In that event, it is no defense in this case that there was a still there. If, however, you find the opposite of that, that he knew about it, then, of course, he had knowledge of it. I say, as to actual knowledge, there is no proof whatever in the case. If you shall find that he should have known about it, under all the situation and circumstances, then the situation would be different; but, in order to make him liable there the test is, did he exercise ordinary care under the situation existing. He had the right, as the lease shows, to go in there to make repairs, but there is no evidence that any such investigation for that matter became necessary during the term that we are interested in here. He never went in there to make repairs; he never went in there, personally, at all. He sent his collector there for the purpose I have already stated.

"Now, you are to find whether, under the charge of the court, if there was a still there, it was within his knowledge or control. If it was, you ought to find for defendant; if it was not, you ought to find for plaintiff, and that defense goes out of the case."

Counsel for appellant, in the presence of the jury, made the following exception to the latter part of this section of the charge: "I desire to except to the charge further with reference to that part of the charge dealing with the control or knowledge of the insured, with respect to the increase of hazard, in that the charge specifies that the lease provides that the lessor might enter for the purpose of making repairs, and there was no evidence that the lessor had occasion to do that, while, as a matter of fact, the lease provides that the lessor or his legal representatives might at all reasonable hours enter upon said premises for the purpose of examining the condition thereof, and making such repairs as the lessor may see fit, which I believe is a reservation of a right by the lessor for two purposes, rather than for the single purpose as indicated in the charge."

The court replied: "That is correct; you are right in that. The policy provides as you have stated, and that will be added to the charge."

"Mr. Willson: In answer to my exception, your Honor, you referred to the policy. I was pointing out a provision of the lease, which reads that the lessor may enter for the purpose of making examination and making repairs.

"The Court: That was a mere inadvertence on the part of the Court. I meant lease, and not policy, gentlemen of the jury. You may consider what I said as amended by the word 'lease,' rather than the word 'policy.' "

■ This exception to the court's charge was thus fully met and satisfied. Counsel for appellant nevertheless insist, under this specification, that the presence in the lease of the provision that "the lessor or its legal representatives may at all times enter upon said premises for the purpose of examining the condition thereof," establishes that the hazard was increased by means within the control of the insured because if appellee had visited the basement, as he had the right to do, he would have found the still, and had the power to enforce its removal. We think, however, that this clause was not intended to impose upon the appellant the burden of an insurer that the hazard should not be increased under all conditions, but rather that it was a circumstance to be submitted to the jury, as was done, upon the question of whether he exercised "ordinary care under the situation existing." This disposes of specifications 4, 9, and 10.

■ 5 and 6. The principles of law stated in these specifications are substantially correct. In the leading case of O'Keefe v. Insurance Co., 140 Mo. 558, 41 S. W. 922, 923, 39 L. R. A. 819, the following definition of total loss is given: "By a total loss is meant that the building has lost its identity and specific character as a building, and become so far disintegrated that it cannot be

properly designated as a building although some part of it may remain standing."

This court, in St. Paul Fire & Marine Insurance Co. v. Eldracher, 33 F.(2d) 675, 681, quotes thus approvingly from Liverpool Insurance Co. v. Heckman, 64 Kan. 388, 67 P. 879: "Although some portion of the building may remain after the fire, yet if such portion cannot be reasonably used to advantage in the reconstruction of the building, or will not, for some purpose, bring more money than sufficient to remove the ruins, such building is, in contemplation of the law, a 'total loss,' or 'wholly destroyed.'"

The converse, then, would be true that, when there remains standing after the fire a substantial portion of the building which can be reasonably used to advantage in the reconstruction thereof, the loss is not total. In such case, "the insured is entitled to recover, for a partial loss, 'a sum of money equal to the damage done to the property.' The damage done to the property is properly ascertainable by proof of the reasonable value of the property immediately prior to the fire and the reasonable value thereof immediately after the fire." Tinsley v. Ætna Insurance Co., 199 Mo. App. 693, 708, 205 S. W. 78; 81. On this feature of the case the court instructed thus: "If you shall find for plaintiff then his measure of damages will depend upon your further finding, of course, as to whether the loss was a total one, or a partial one; if, under the evidence, you conclude to find for plaintiff that the loss was a total one, gentlemen, then you are warranted in finding the amount of thirty-five hundred dollars in favor of the plaintiff. In estimating the amount of loss or damage for the loss suffered, under the policy, you should first ascertain from all the facts and circumstances given in evidence, the fair cash value of the insured property immediately before the fire, and then from that evidence you should ascertain the fair cash value of the property not totally destroyed, immediately after the fire, and from the value before the fire subtract the value after the fire, and that difference will be the total amount of loss and damage sustained."

We think the court in this portion of the charge correctly stated the measure of damages in case of partial loss. Evidence of the cost of repairs was proper as throwing light upon the question of value after the fire, but not as a measure of value. Tinsley v. Ætna Insurance Co., supra.

■ 11. We think this specification of error contains a correct statement of the law. The ex parte written estimate of the cost of repair was Exhibit F, and was submitted by appellee apparently in corroboration of, or as an addition to, the testimony of his witness Amber. It was not used, nor was it necessary, to refresh the memory of the witness. In such case the admission of an ex parte statement should be denied. Curry v. Lackey, 35 Mo. 389; Thomure v. St. Louis & San Francisco R. R. Co., 191 Mo. App. 640, 177 S. W. 708. In Johnstone v. Home Insurance Co. of New York (Mo. App.) 34 S.W.(2d) 1029, upon which appellee relies to support the admission of this exhibit, it appears that the theory upon which the exhibits were admitted in that case was, not to prove the cost of repairs, but rather to prove compliance with an appraisement requirement in the policy of insurance. Liability was denied because of alleged failure to comply with this provision.

■ 12. The form of the reply to the new matter set up in the answer of appellant is defective, and the reply insufficient under the Missouri Code of Civil Procedure, sections 779 and 780, Rev. St. Mo. 1929, as construed by the Missouri courts. However, it has been held that when a defendant fails to stand upon his motion for judgment on the pleadings, and goes to trial on the merits, he waives any error committed in overruling that motion. Sundmacher v. Lloyd, 135 Mo. App. 517, 523, 116 S. W. 12; Nelson v. Wallace, 48 Mo. App. 193; Crow v. C. & A. Ry. Co., 57 Mo. App. 135, 138.

■ We come now to specifications No. 7 and 8, presenting assignments of error which demand serious consideration. The situation presented by these specifications is best understood by quotation from the record. On direct examination the witness Kremer for plaintiff testified as follows: "As to the reasonable cash value of what was left there after the fire, there are two answers to that question. It is a liability in one instance, and in the other instance it would have a cash value if it was re-used to rebuild the building as it was originally. As it stood there and appeared in March of 1930, I would say that the reasonable cash value of what was there was $500.00 less than nothing. In other words, it would cost about that much money to remove the building. It had no value without making the repairs."

Directly thereafter, in the course of a somewhat extended cross-examination, the witness gave this testimony: "I would say that the actual value of what was remaining there at the time I examined it following the

fire to be used in replacing the building would be about 50 per cent. of the total. * * * The cash value of the whole building, prior to the fire, was somewhere between $16,000.00 and $17,000.00. Repair work always costs anywhere from twenty-five to fifty or sixty per cent that it would take in building a new building. * * * The value of what remained there after the fire occurred for purposes of rebuilding the building, giving you the depreciated value, is probably $6,000.00 or $7,000.00, leaving a difference of about $9,-000.00. It is pretty hard to estimate; it is somewhere approximately 45 per cent. or 50 per cent."

"Redirect Examination.

"Q. What was the cash value of what was actually there; what was the reasonable cash value of what was left there?

"The Court: He has told you that; he said five hundred dollars less than nothing.

"Mr. Willson (for appellant): And he now says that it is something like six thousand dollars.

"The Court: I beg your pardon, he does not.

"Mr. Willson: I asked him that question. I would like to question him further, then.

"The Court: No, I will not permit you to question him further, I am getting tired of this long drawn-out lawsuit, and these questions, about a very simple matter. The jury heard it just like I did.

"Mr. Willson: I misunderstood the witness, and I would like it to be straightened out in my own mind. I will take your Honor's version of it. I know the accuracy with which your Honor makes notes about these things, and I am at sea as to what the witness said.

"The Court: Well, he said it now once or twice, maybe three times, and that is enough. I do not care whether you understood it or not; the jury will.

"To which action of the court, the defendant, by its counsel, then and there, at the time, duly excepted."

The complaint of appellant is, as embodied in these two specifications, that "the action of the trial court in affirmatively misleading the jury with an erroneous statement of fact, followed by an arbitrary refusal to permit appellant's counsel to clarify the question by further cross-examination of the witness, was error highly prejudicial." The testimony of this witness was material upon a crucial question in the case, to wit, whether the part of the building remaining after the fire had val-

ue as reasonably susceptible of being used to advantage in repair and reconstruction, and what that value was. The quoted testimony shows that the learned trial judge inadvertently fell into a serious misapprehension respecting the statements of the witness, and further cross-examination, as requested, should have been permitted to clarify the situation. The charge of the court failed to remedy the mistake. In its charge upon the measure of damages and elsewhere, the rule entitling a plaintiff to recovery as for partial loss, and its application in the case under consideration, was not stated. The language of the court respecting the testimony of the witness Kremer, and his indirect rebuke of counsel in refusing permission for further cross-examination, was calculated to impress the jury with the conviction that the building was a total loss. The impression thus conveyed was so far prejudicial as to require a reversal of the judgment. In view of this necessary disposition of the case, we have discussed a number of assigned errors with the expectation that such questions may be eliminated in a second trial of the case. The judgment is reversed, and remanded for a new trial, in harmony with the views herein expressed.