STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. S. GRILL D'IPPOLITO, DEFENDANT-APPELLANT.

Argued October 8, 1956—Decided October 22, 1956.

*Mr. Carl Kisselman* argued the cause for appellant.

*Mr. George H. Stanger,* County Prosecutor, argued the cause for the State (Mr. Wallace R. Foster, Assistant County Prosecutor).

The opinion of the court was delivered by

WACHENFIELD, J.  The defendant, D'Ippolito, was indicted, tried and convicted for false swearing in contravention of *N. J. S.* 2A:131-4.

A prior conviction upon the same indictment was reversed by us because of unfair and prejudicial comments made by the prosecutor in reference to the defendant's failure to

produce character witnesses. *State v. D'Ippolito,* 19 *N. J.* 540 (1955).

On retrial, the jury again returned a verdict of guilty and the defendant was sentenced to a fine of $1,000 and imprisonment for one to three years in the State Penitentiary. The latter portion of the sentence was suspended in favor of a probationary period of three years.

D'Ippolito was Chief of Police of Vineland and had served on the police force in various capacities for almost 22 years. He and Joseph Callavini, a patrolman, "raided" the Vineland office of one Lewis Levenberg, who was suspected of bookmaking. Levenberg was present at the time of the raid but denied being engaged in any illegal activity.

D'Ippolito and Callavini were in accord on finding and confiscating a morning newspaper, a racing form and a small radio. They differed, however, on whether or not there were also betting slips on Levenberg's desk of which the chief allegedly took possession, placing them in his pocket. Callavini states this to be so, while D'Ippolito emphatically denies it. This factual conflict gives rise to the issues forming the basis on which the charge rested.

Levenberg was placed under arrest, taken to police headquarters and interrogated. His protestations of innocence were constant, his insistence being he was only a bettor. He declared his wagers were placed with one Joseph Ruben, who, because of the accusation so made, was also taken into custody.

The chief of police, as the complaining witness, filed complaints against both Levenberg and Ruben charging bookmaking. Both prisoners were liberated on bail. Within several weeks they were arraigned before the Vineland magistrate, Frank Testa.

On behalf of the prosecution, D'Ippolito was the only witness to take the stand. After testifying, he evinced considerable chagrin at making the charge because he opined there was no evidence to support it. The magistrate asked rather pointedly if D'Ippolito had found in Levenberg's office "any slips or anything to indicate that there was gambling

going on or any bookmaking," and D'Ippolito replied: "No, that [a morning newspaper and a racing form] is all I found."

It was contended by the State that in giving this answer the defendant swore falsely, thus violating *N. J. S.* 2*A*:131–4, as there were in fact betting slips found on the desk in Levenberg's office, and that the defendant took possession of them when Levenberg was taken into custody. Callavini, the police officer, so testified. The chief, on the contrary, denied the search of the premises produced any such betting slips.

Much of the testimony centers upon the controversial issue as to whether or not two writings, one purporting to be a copy of Callavini's alleged routine report of the visit to Levenberg's office and the other a substituted report made to replace the original when the latter was found to be missing from the police department files, were admissible in evidence. They were marked, respectively, S-7 and S-8.

Thomas Jost, Jr., a patrolman in the Vineland Police Department, testified he examined the police files on the day following the raid and checked the files again 10 or 12 times between that date and some time in January or February of 1954. On each occasion he saw a report which appeared to be signed by Callavini in the files. He read the report and requested Captain Rossi, a superior officer in the department, to make a copy for the Law Enforcement Council, and testified the purported copy, S-7, was the one delivered to the witness by Rossi in compliance with the request.

Rossi testified that at Jost's request he copied a report which he found in the police files during the night of April 24-25, 1954; that S-7 was an exact copy, including punctuation marks, which he delivered to Jost on that morning; he examined the file a few days later and the report which he copied was no longer there but had been replaced by another report, presumably S-8.

Callavini asserted he prepared his original report of the Levenberg raid on the afternoon of the day of the raid prior to the arrest of Ruben and that he "laid it on the chief's desk in his room." He further testified that in May 1954

the chief asked him where the Levenberg report was—it was missing from the file—and when Callavini informed him he did not know where the report was, the chief told Callavini to prepare another one and "told me what to put on the report." He admitted, however, that D'Ippolito did not tell him specifically to omit any reference to "slips."

Over objection, the court admitted the copy of the original report, S-7, upon the theory it was evidential as an adoptive admission, while the admission of S-8 was justified as being a statement or admission authorized by D'Ippolito. Motions to strike the exhibits were denied.

It is now insisted there was error in admitting into evidence S-7 upon two grounds: first, it was a prior consistent statement of the witness Callavini, and secondly, it was not shown to have been within the knowledge of the defendant or agreed to by him so as to make it an adoptive admission.

██ Much authority is submitted to demonstrate that a party may not support his own witness by his prior consistent statements or writings. *State v. D'Ippolito,* 19 *N. J.* 540 (1955); *Gluck v. Castles Ice Cream Co.,* 104 *N. J. L.* 397 (*E. & A.* 1928); *State v. Griffin,* 19 *N. J. Super.* 581 (*App. Div.* 1952); *cf. Capozzoli v. Capozzoli,* 1 *N. J.* 540 (1949); *Patriotic Ins. Co. v. Franciscus,* 55 *F. 2d* 844 (*8th Cir.* 1932); *Yoder v. U. S.,* 71 *F. 2d* 85 (*10th Cir.* 1934); *Mellon v. U. S.,* 170 *F. 2d* 583 (*5th Cir.* 1948). See also 4 *Wigmore on Evidence* (*3d ed.* 1940), §§ 1124 and 1125; 17 *Va. L. R.* 696 (1930–1931); 6 *Wash. L. R.* 112 (1930–1931).

We are not contrary to these authorities, but the State did not rely on this theory for the admission of the exhibit in question. It was offered and received in evidence as an adoptive admission by the defendant of the contents of the document. Callavini testified he placed his original report on D'Ippolito's desk while the chief was interrogating Levenberg. Admittedly, no one saw the defendant read the report, but there was testimony, however, that the chief's office was entirely private and that he locked the door when away from police headquarters.

Jost found Callavini's report in the proper file on the day after the raid and on 10 or 12 occasions thereafter in early 1954 checked the file and read the same report specifically mentioning the discovery of betting slips in Levenberg's office. The witness said it was not until some time in May or June, after the State Law Enforcement Council made demand on the defendant for the police reports on all gambling raids in Vineland, that he discovered Callavini's original to be missing and a substitute not referring to the betting slips in its place.

The Law Enforcement Council apparently relied upon Jost for information on the activities of the local police department, and he in April requested Captain Rossi to make a copy of the original Callavini report. Rossi testified he proceeded to type out a copy exact to the most minute detail and handed the copy so made to Jost on the next day in the alley outside of police headquarters. Jost relinquished it immediately to a trooper who was acting as a liaison officer for the Law Enforcement Council.

The Chief Justice in his opinion in the prior case, *State v. D'Ippolito*, 19 *N. J.* 540 (1955), specified the circumstances under which prior statements might become relevant, permitting their admission:

"* * * If it was shown that the defendant had knowledge of and agreed with the contents thereof or that the reports were in fact made under his direction, they would be admissible, *Wigmore on Evidence* (*3d ed.*) §§ 1071, 1073; see also annotation under *Rules* 63 (7) and (8) in *Report of the Committee on the Law of Evidence to the Supreme Court*, May, 1955, *pp.* 135–137. They would be previous statements of the defendant or adoptive admissions by which he would be bound, and would bear not only on the credibility of the defendant's denial that he swore falsely but also on the probability of the fact of false swearing. The ultimate introduction of these documents is attended by other fundamental requirements and considerations which when satisfied would make them admissible, *Wigmore, supra*."

The evidence here shows quite conclusively that the defendant had possession of Callavini's report. It was placed upon his desk in his presence, and his office was a separate

unit disassociated from the balance of police headquarters. Although D'Ippolito denied seeing the report, it was proved by virtue of his own prior statements that he referred to it at the Levenberg hearing before Judge Testa.

The facts as proven by the prosecution support the reception of the copy of Callavini's report as an adoptive admission within the orbit as described in the Chief Justice's opinion.

As to the admission of the copy instead of the original, the prerequisites for dispensation with the "best evidence" rule were completely satisfied. The existence of the original and its disappearance were substantiated by ample testimony, including the defendant's admission, and Rossi testified the copy was an exact duplicate of the original. 2 *Wharton, Criminal Evidence* (12th ed.), pp. 477–80. This document was properly admitted as an adoptive admission.

It is next asserted a reversal is dictated because of an alleged misstatement of law, sanctioned by the court over defendant's objection, in the prosecutor's summation.

The prosecutor said:

"When a witness testifies to any fact that is proven to be false, even in this one instance, the jury is then entitled to find that his testimony might be false in its entirety."

It is insisted important qualifications of this general principle were omitted and the jury received a misleading impression entitling them to disregard entirely the testimony of the defendant if they found it to be controverted in any insignificant aspect.

This maxim should not apply unless the witness willfully testified falsely to some material fact. *Coleman v. Public Service Coordinated Transport,* 120 *N. J. L.* 384 (*Sup. Ct.* 1938) ; *State v. Samuels,* 92 *N. J. L.* 131 (*Sup. Ct.* 1918).

Inadvertent misstatements or immaterial falsehoods are not ground for complete rejection of a witness' testimony. Taken in the abstract, the prosecutor's statement was open to some criticism as the pith of the maxim rests

on conscious falsehood concerning a fact material to the issue. But we see no reversible error prejudicial to the extent of requiring a new trial.

It is perfectly apparent from a reading of the record that the testimony of the defendant was willfully given and that the evidence warranted an imputation of willful perjury which was by no means the result of a mistake or error. The defendant's statement was the key to the entire case and the foundation upon which the prosecution was built. Under the circumstances, it could have been nothing but a conscious falsehood concerning a material fact, and we think this was obvious to the jury.

The misunderstanding in reference to the niceties of the maxim could easily have been corrected by a request to charge to the court embodying the approved doctrines, but no such effort was made by counsel for the defendant, who relied merely upon his objection in the hopes it would pay dividends if a verdict of conviction was returned.

As was said in *State v. Witte,* 13 *N. J.* 598, 611 (1953):

"Unless the vice is plainly ineradicable by an instruction to the jury, a mistrial is not allowable of right. * * *"

Then, too, there is the rule enunciated in *State v. Orecchio,* 16 *N. J.* 125 (1954), in which we held that incidental legal errors which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair may not be invoked to upset an otherwise valid conviction.

There are other points relied upon, such as error in refusing to charge as requested, in the denying of a motion for the defendant at the close of the State's case and at the end of all of the testimony, error in the judge's denying a motion to set aside the verdict as contrary to the weight of the evidence, and a denial of a fair trial, which have not sufficient substance or merit to require specific discussion.

This is the second jury which has passed upon the same testimony with the same result. A full, complete study of

the record satisfies us there was a fair trial without prejudicial error in which the defendant had his full day in court, represented by competent counsel, resulting in an adjudication of guilt which our consideration of the record makes us conclude was in conformity with the testimony offered.

The judgment of conviction below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING and JACOBS—5.

*For reversal*—None.