**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0898-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHARLES M. LOWY,

    Defendant-Appellant.

_____

Submitted January 25, 2021 – Decided February 16, 2021

Before Judges Fasciale and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 18-07-0573.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele A. Adubato, Designated Counsel, on the brief).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Erin M. Campbell, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant appeals from a July 23, 2019 judgment of conviction for reckless manslaughter and the sentence imposed. He also appeals from the denials of his motion to suppress his statement to the police and motion to strike portions of the medical examiner's testimony. We affirm.

The uncontested facts are taken from the trial testimony. Defendant lived near Pershing Field Park in Jersey City, where he went nearly every day to feed the pigeons. At sixty-eight years of age, defendant suffered health problems, including spinal stenosis, and required a cane to walk.

The victim and his wife lived adjacent to Pershing Field Park. The victim, age seventy-seven, frequently took a morning walk in the park with a cup of coffee. According to his wife, the victim loved the park. He enjoyed walking in the park for exercise and watching the baseball players. Occasionally, the victim would sneak a cigarette in the park.

On April 15, 2017, at around 7:00 a.m., defendant went to the park to feed the birds. There were signs posted throughout the park prohibiting bird feeding. A park employee saw defendant that morning and warned him there was a fine for feeding the birds. The park employee recognized defendant as he came to the park nearly every day to feed the birds. Although the park employee

A-0898-19

repeatedly warned defendant not to feed the birds, he never reported defendant's violation of the park rules.

That same morning, the victim went for a walk in the park. Prior to leaving the house, the victim told his wife someone was feeding the birds contrary to park policy. The victim believed feeding the birds was unsanitary and the scattered birdseed attracted rats.

Jeffrey Eitel was walking his dogs in the park that morning and saw two older men fighting. Eitel kept his distance because he thought the men were homeless or drunk. He described one man as "wearing a spring jacket . . . shiny like a windbreaker[,]" while the other was wearing a red hoodie and blue jeans and "had a cane on the ground next to him."[1]

Eitel heard the victim scream, "Call 9-1-1. He's got a knife. Call 9-1-1." He witnessed the victim holding defendant's arm, trying to push defendant away. According to Eitel, the two men were wrestling and throwing punches. Eitel placed the 9-1-1 call. He told the operator he was unsure whether there was a knife involved in the altercation but stated two men had been fighting, and a man wearing a red hoodie left the scene. Initially, Eitel reported to the operator

---

[1] According to the eyewitness, the victim wore the windbreaker jacket and defendant wore the red hoodie.

A-0898-19

the victim had blood on his hands but quickly realized the victim "had taken wounds to the chest and that th[e] blood on his hands was probably from his chest wounds." Eitel requested immediate medical assistance. The operator instructed pressure be applied to the victim's injuries until help arrived.

Patrick Ryan was in the park for a morning run when he saw two men "wrestling" and the victim "trying to hold [defendant] down." Ryan recognized the victim, having seen him often in the park "smoking a cigarette and . . . drinking coffee." As Ryan passed the men, the victim called out, "Hey, buddy, can you give me a hand? This guy's got a knife." Ryan said the victim was "in distress . . . fighting for his life." When he got closer, Ryan saw defendant "on his stomach and just laying there with a knife in his hand" while the victim held defendant down. Ryan instructed defendant to "[p]ut the knife down and get out of here." At that point, the victim released defendant. Defendant uttered some words in German, put away a folding knife, and left the park.

Ryan moved the victim to a bench. At first, Ryan only found cuts on the victim's hands. Upon closer inspection, he noticed chest wounds and applied pressure to the wounds in an effort to stop the bleeding. Soon after, the victim lost consciousness. Emergency services personnel arrived and took the victim to a local hospital where he died at 9:04 a.m.

4

A third witness, Lee Alan Barrett, was in the park during the incident. While walking his dog, he saw the victim and defendant engaged in a physical altercation and remained at the scene as the events unfolded.

Following the incident, a detective went to the park, took pictures of the crime scene, and conducted a sweep. In addition, the detective went to defendant's apartment where she recovered a couple of rings, a knife with a reddish stain, and clothing, which included a pair of blue and orange sneakers and a damp red-hooded sweatshirt and jeans.

Frederick DiCarlo, M.D., a medical examiner, performed the autopsy on the victim. According to the autopsy results, the victim suffered two stab wounds, one to the "midchest" and the other to "the upper left chest near the midline." DiCarlo concluded the wounds were inflicted with "single-edged knife[,]" meaning one side of the knife was blunt and the other side was sharp. He also noted abrasions on the victim's knees. DiCarlo determined the cause of death was "homicide" from "stab wounds of the chest." He explained one stab wound did not breach the chest wall, but the other wound cut the lung, which resulted in blood loss, compromising the victim's breathing and organ shutdown. Although not contained in the autopsy report, at trial, DiCarlo testified, "[B]ased on these injuries and the circumstances surrounding the incident, the injuries

5

were, to a reasonable degree of medical certainty, inflicted while [the victim and defendant] were facing each other."

During the initial investigation, defendant's neighbor gave the police a video depicting a man using a knife to cut ropes on a tree in the neighbor's yard a year before the altercation in the park. Based on the description of the knife wielding assailant provided by the police, the neighbor recalled the video recording. He told the police the man in the recording lived at the same address as defendant and "fed the birds . . . ."

Defendant was arrested on April 18, 2017. While in custody, defendant complained of back pain. Defendant went by ambulance to a local hospital, accompanied by Detective John Mikhail. Mikhail testified, "At approximately 1:50 p.m., [while in the ambulance,] Mr. Lowy spontaneously uttered, 'I don't know why I'm here. I was feeding the birds. I haven't left my house in five to six days.' He also stated, 'this stays between us.'" While in the hospital, at about 3:15 p.m., defendant made additional statements to Mikhail and another officer. He asked the officers, "Can you do an emergency killing and put me out of my misery. I intended to just kill myself." According to Mikhail, defendant "placed two hands on top of each other and brought [them] up to his neck." Mikhail told defendant it was "important to take care of his medical condition, and

6

receive the appropriate medical treatment." The officers made no additional statements to defendant either in the ambulance or at the hospital. Defendant was treated, discharged the same day, and returned to police station.

Defendant was charged with first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (a)(2) (count one), fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count two), and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4 (count three).

Prior to trial, the State moved to introduce defendant's statements to the police officers. An evidentiary hearing was held on December 7, 2018 and continued on December 13, 2018. Detective Mikhail testified at the hearing. The judge concluded defendant's statements were admissible because "defendant initiated the conversation with Detective Mikhail unprompted and voluntarily." The judge acknowledged defendant "invoked his right to remain silent at the police precinct, but this [c]ourt cannot conclude that [the] police failed to honor that right simply because defendant made an unprompted statement or statements subsequent to his invocation." Under the circumstances, the judge held the "[p]olice were not required to Mirandize defendant" and found "the statements were made spontaneously and voluntarily by defendant." The

7

judge issued an order on December 13, 2018, allowing the State to use defendant's statements during the trial.

Trial commenced on June 25, 2019. On July 23, 2019, the jury returned a verdict of not guilty on all counts except for the lesser-included offense of reckless manslaughter.

Defendant was sentenced on October 4, 2019. After analyzing the applicable aggravating and mitigating factors, the judge imposed an eight-year sentence with an eighty-five percent parole ineligibility.

On appeal, defendant raises the following arguments:

POINT I

> STATEMENTS MADE BY MR. LOWY AFTER HIS INVOCATION OF HIS RIGHT TO COUNSEL WAS A VIOLATION OF HIS FIFTH AMENDMENT RIGHT TO REMAIN SILENT AND SHOULD NOT HAVE BEEN ADMITTED INTO EVIDENCE.

POINT II

> IT WAS ERROR FOR THE COURT TO DENY DEFENDANT'S MOTION TO STRIKE CERTAIN PARTS OF THE TESTIMONY OF THE MEDICAL EXAMINER WHICH HAD NOT BEEN DISCLOSED PRIOR TO TRIAL.
>
> A. Violation of the discovery rules.
>
> B. The expert's testimony exceeded the scope of his expertise.

## POINT III

CERTAIN COMMENTS BY THE PROSECUTOR DURING HER SUMMATION WERE GROSSLY IMPROPER AND MANDATE A NEW TRIAL.

## POINT IV

THE COURT ERRED IN INCLUDING A FLIGHT INSTRUCTION IN ITS FINAL CHARGE TO THE JURY OVER THE DEFENDANT'S OBJECTION.

## POINT V

A REMAND FOR RESENTENCING IS REQUIRED BECAUSE THE COURT ERRED IN WEIGHING THE AGGRAVATING AND MITIGATING FACTORS IN IMPOSING ON DEFENDANT A SENTENCE OF EIGHT (8) YEARS WITH 85% PAROLE INELIGIBILITY. IT WAS EXCESSIVE AND SHOULD BE MODIFIED AND REDUCED.

## POINT VI

THE AGGREGATE OF ERRORS DENIED DEFENDANT A FAIR TRIAL.

We first consider defendant's argument the judge erred in admitting the statements made to the police while he was in the ambulance and at the hospital. Defendant contends the admission of the statements violated his Fifth Amendment right to remain silent. We disagree.

9

After receiving the <u>Miranda</u>[2] warnings at the police precinct, defendant invoked his right to counsel. Shortly thereafter, defendant complained of pain and was taken to the hospital in an ambulance accompanied by Detective Mikhail. Defendant claims the detective had a duty to re-Mirandize him as soon as he spoke in the ambulance because Mikhail knew defendant invoked his right to counsel while at the police station.

Our review of a trial court's grant or denial of a motion to suppress a defendant's statement is deferential. <u>State v. Vincenty</u>, 237 N.J. 122, 131-32 (2019). If a trial court's findings are supported by sufficient, credible evidence present in the record, our task is complete, and we should not disturb the result. <u>State v. Hubbard</u>, 222 N.J. 249, 263 (2015). Deference is appropriate because findings of fact "are substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." <u>State v. Johnson</u>, 42 N.J. 146, 161 (1946). Findings of fact should only be disregarded if they are "clearly mistaken" while "legal conclusions are reviewed de novo." <u>Hubbard</u>, 222 N.J. at 263.

The Fifth Amendment guarantees no person "shall be compelled in any criminal case to be a witness against himself . . . ." <u>U.S. Const.</u> amend. V. To

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

effectuate the protections under the Fifth Amendment, individuals must be advised of their right to remain silent or consult counsel when subject to custodial interrogation. Miranda, 384 U.S. at 444. These rights may be waived, but only if done so "voluntarily, knowingly[,] and intelligently." Ibid. If, however, rights are unambiguously invoked, which may be done at any time, questioning must cease immediately. Id. at 444-45. Once a person invokes the right to remain silent, this choice must be "scrupulously honored" by investigators. State v. Hartley, 103 N.J. 252, 255-56 (1986).

While officers must scrupulously honor a suspect's invocation of his or her rights, they have no obligation to re-Mirandize if statements are made spontaneously by a defendant. State v. Fuller, 118 N.J. 75, 85 (1990) ("[I]n defendant-initiated conversation following the exercise of the right to silence, the police need not readminister the Miranda warnings as an indispensable element of their duty scrupulously to honor that right."). "If an accused does initiate a conversation after invoking his rights, that conversation may be admissible if the initiation constitutes a knowing, intelligent, and voluntary waiver of the accused's rights." State v. Chew, 150 N.J. 30, 61 (1997).

Here, after invoking his right to counsel, defendant voluntarily spoke to the officers in the ambulance and at the hospital. His statements were

11

unprompted and unprovoked by the officers. Importantly, after defendant spoke, the officers did not respond other than to indicate medical aid would be rendered. Based on these facts, the judge properly admitted defendant's statement to the police.

We are also satisfied the judge properly admitted defendant's utterances as statements by a party opponent. A statement by a party opponent is "[a] statement offered against a party which is: (1) the party's own statement, made either in an individual or in a representative capacity . . . ." N.J.R.E. 803(b). Statements made pursuant to N.J.R.E. 803(b)(1) constitute "competent evidence" and are admissible. Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 358 (2013).

Here, the statements uttered by defendant to the police while he was in the ambulance and at the hospital were offered by the State to be used against defendant at trial. Under the circumstances, defendant's utterances were admissible statements by a party opponent.[3]

---

[3] In a single sentence in his merits brief, defendant also contends his statement to the police regarding an "emergency killing" should have been excluded under N.J.R.E. 403. However, defendant failed to explain the basis for this argument and omitted any discussion of applicable law or the basis for his contention. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

We next consider defendant's claim the judge erred in declining to strike portions of the medical examiner's testimony. He argues Dr. DiCarlo's trial testimony that defendant and the victim were "facing each other" at the time of the stabbing was improper because it was not contained in the medical examiner's expert report, not disclosed prior to trial by the State, and exceeded the scope of the doctor's expertise. We reject these arguments.

Rule 3:13-3 governs discovery in criminal matters and compels disclosure of exculpatory information or material. The Rule requires disclosure of the following:

> names and addresses of each person whom the prosecutor expects to call to trial as an expert witness, the expert's qualifications, the subject matter on which the expert is expected to testify, a copy of the report, if any, of such expert witness, or if no report is prepared, a statement of the facts and opinion to which the expert is expected to testify and a summary of the grounds for each point.
>
> [R. 3:13-3(b)(1)(I).]

"[T]he purpose of pretrial discovery is to ensure a fair trial" because "[a] criminal trial where the defendant does not have 'access to the raw materials integral to the building of an effective defense' is fundamentally unfair.'" State in Interest of A.B., 219 N.J. 542, 556 (2014) (quoting Ake v. Oklahoma, 470

U.S. 68, 77 (1985)). If a party fails to comply with discovery requirements, the evidence sought to be admitted may be barred at trial. R. 3:13-3(f).

"A trial court's resolution of a discovery issue is entitled to substantial deference and will not be overturned absent an abuse of discretion." State v. Stein, 225 N.J. 582, 593 (2016) (citing State v. Hernandez, 225 N.J. 451, 461 (2016)). However, if disposition of a discovery matter is "based on a mistaken understanding of the applicable law[,]" deference is not afforded. Ibid. (quoting Hernandez, 225 N.J. at 461).

Having reviewed the record, we are satisfied the judge properly denied defendant's motion to strike a portion of the medical examiner's trial testimony. While Dr. DiCarlo's testimony, stating defendant and the victim were facing each other at the time of the stabbing, was a surprise to both counsel, the statement was not exculpatory. In addition, DiCarlo's statement was consistent with his autopsy finding that the victim died as a result of the stab wounds. Defense counsel also had the opportunity to speak with DiCarlo prior to his testimony and then cross-examine the medical examiner at trial regarding his statement.

Further, based on DiCarlo's "surprise" testimony, the judge instructed the jury could accept or reject the medical examiner's testimony, in whole or in part.

Thus, any ill effects resulting from the medical examiner's testimony were mitigated by the judge's jury instruction. On this record, the State did not violate the discovery rules.

Nor did the medical examiner's testimony regard the position of the victim and defendant at the time of the stabbing exceed the scope of the doctor's expertise. Defendant argues DiCarlo, as a pathologist, was limited to testifying as to "manner and cause" of death and "was not qualified to opine on the physics or outside forces that were at play during the incident."

N.J.R.E. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

There are three core requirements for determining the admissibility of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Creanga v. Jardal, 185 N.J. 345, 355 (2005)).]

A-0898-19

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court."  Townsend, 221 N.J. at 52 (citing State v. Berry, 140 N.J. 280, 293 (1995)).  As such, "a trial court's grant or denial of a motion to strike expert testimony is entitled to deference on appellate review[,]" and we apply an abuse of discretion standard.  Id. at 52-53.  (first citing Bender v. Adelson, 187 N.J. 411, 428 (2006); and then citing Pomerantz Paper Corp. v. New Comty. Corp., 207 N.J. 344, 371-72 (2011)).

Here, DiCarlo testified, "given the positioning of the victims, we're taking into account the size of the victim and the defendant.  So, based on these injuries and the circumstances surrounding the incident, the injuries were, to a reasonable degree of medical certainty, inflicted while the two people were facing each other."  The judge concluded Dr. DiCarlo's testimony was "based on [his] training, and it [wa]s within his field, [and] based on his experience and knowledge" as an experienced pathologist.

DiCarlo's remarks regarding the position of the two men at the time of the stabbing fell within his expertise as a pathologist determining the cause of death. See State v. Locascio, 425 N.J. Super. 474, 492-93 (App. Div. 2012) (determining the opinions and conclusions offered by a pathology expert regarding the nature and cause of death were permissible but excluding

16

testimony in the area of accident reconstruction and biomechanics as exceeding the expert's qualifications).  DiCarlo did not rely on any specialized knowledge outside his expertise as a pathologist and the judge correctly denied defendant's motion to strike his testimony as to the position of the men at the time of the stabbing.

We next consider defendant's claim certain comments by the prosecutor during summation were improper, warranting a new trial.  He contends the prosecutor denigrated defense counsel's cross-examination of a witness, improperly misstated the law, and inappropriately instructed the jury defendant was guilty under the law.  We are unpersuaded these statements were improper.

Our court recognizes that "[p]rosecutors are afforded considerable leeway in [summations] as long as their comments are reasonably related to the scope of the evidence."  State v. Cole, 229 N.J. 430, 457 (2017) (first alteration in original) (quoting State v. Frost, 158 N.J. 76, 82 (1999)).  They can "strike hard blows . . . [but not] foul ones."  State v. Echols, 199 N.J. 344, 359 (2009) (alterations in original) (quoting State v. Wakefield, 190 N.J. 397, 436 (2007)). It is just as much the prosecutor's duty "to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  State v. Farrell, 61 N.J. 99, 105 (1972)

(quoting Berger v. United States, 295 U.S. 78, 88 (1935)). Prosecutorial "misconduct does not warrant reversal unless it is 'so egregious that it deprived the defendant of a fair trial.'" State v. Jackson, 211 N.J. 394, 409 (2012) (quoting Frost, 158 N.J. at 83)).

Here, none of the prosecutor's statements during summation rose to a level of egregiousness capable of rendering the trial unfair. During closing, the prosecutor made the three statements in response to issues raised during trial.

The first statement to which defendant objected was the prosecutor's comment during closing argument that the name of the witness's dog was irrelevant. During cross-examination, defense counsel sought to discredit the State's witness who was walking a dog. Defense counsel repeatedly asked the witness if the dog's name was "Archie" or "Rex." Based on the questions posed by defense counsel during cross-examination of this witness, the prosecutor sought to refocus the jury and establish the dog's name bore no relevance to the witness's observation of the fight between defendant and the victim.

Defense counsel also objected to the prosecutor's statement comparing the use of a knife and a fist during a fight. In response to the defense counsel's objection, the prosecutor noted the statement was "her argument to [the jury], that [it] cannot equate a knife and fists." When instructed by the judge to clarify

her statement, the prosecutor said, "You won't hear that from the judge. That's my argument to you." While the prosecutor advocated how the law should be applied, she never stated the jury must find defendant guilty. Further, the judge told the jury "comments of the attorneys are not evidence" and "any comments made by the attorneys . . . as to the law are not controlling."

Finally, the prosecutor did not act improperly by stating defendant was guilty because a prosecutor may "contend that the evidence proved defendant guilty as charged." State v. Michaels, 264 N.J. Super. 579, 641 (App. Div. 1993) (allowing the State to write the word "guilty" on a board during summation because a prosecutor may make reasonable inferences, which the jury can either accept or reject). Here, the prosecutor argued defendant was guilty "based on a totality of the circumstances." Moreover, she told the jury "to follow the law" and "to make a decision that's based on the evidence . . . not on the sympathy." Unlike the previous statements, defense counsel did not object to this statement by the prosecutor. The lack of any objection to the statement suggests the absence of any prejudice. State v. Ramseur, 106 N.J. 123, 323 (1987) ("If no objection is made, the remarks usually will not be deemed prejudicial.").

Even if the prosecutor's comments exceeded fair comment based on the evidence, the judge's jury instructions provided a curative effect. See ibid.

19

(holding despite the prosecutor's improper comments, the judge's jury instruction negated any ill effects); see also State v. Farmer, 366 N.J. Super. 307, 319 (App. Div. 2004) (citing State v. Cooper, 151 N.J. 326, 370 (1997)) ("The jury is presumed to adhere to instructions, and [the court] must assume the jury followed that mandate."). The judge instructed the jury on several occasions that she would instruct them at the conclusion of the case regarding the applicable law.

We next consider defendant's argument the judge erred in instructing the jury on flight. Defendant argues there was no credible evidence "[he] fled the scene due to consciousness of guilty of the crime charged." He contends he left the park because someone told him "get out of here." He also claims it was not clear the victim had been seriously injured, suggesting there was nothing to cause him to flee the scene.

Our standard of review of jury charges is well settled. "[A]ppropriate and proper [jury] charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). "Because proper jury instructions are essential to a fair trial, 'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the

20

defendant." Baum, 224 N.J. at 159 (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)).

It is a "well-established principle that certain conduct of a defendant subsequent to the commission of a crime may indicate consciousness of guilt." State v. Phillips, 166 N.J. Super. 153, 159 (App. Div. 1979). An example of such conduct is unexplained flight. Id. at 160. Flight is distinct from departure, which does not imply guilt. State v. Long, 119 N.J. 439, 465 (1990). A flight instruction should be given when an unexplained departure "reasonably justif[ies] an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt." State v. Mann, 132 N.J. 410, 418-19 (1993) (quoting State v. Sullivan, 43 N.J. 209, 238-39 (1964)). The probative value of evidence related to flight

> depends upon the degree of confident with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charge to actual guilt of the crime charged.
>
> [Id. at 420 (quoting United States v. Myers, 550 F.2d 1036, 1049 (1977).]

Here, defense counsel objected to the flight charge. However, the judge denied the request to exclude the charge, stating "I think the flight charge

informs the jury that if they do not feel that it constituted flight judge because he departed, they can view as such." In support of the flight charge, the judge explained "the jury is going to have to make that determination as to whether or not it's really flight."

Having reviewed the record, the judge properly included the flight charge because the jury could reasonably infer flight based on the eyewitness testimony. Eitel testified defendant "had already started walking away" between the time of the 9-1-1 call and the victim being moved to the park bench. Although Ryan told defendant to leave the park, he testified defendant spoke some words in German as he left. In addition, Barrett testified defendant left the park at a "fast walk."

The flight charge was also supported by evidence defendant stopped going to the park after the incident. Further, nothing prevented defendant from arguing he did not possess a consciousness of guilt because he acted in self-defense. Under these facts, we discern no error in the flight charge instruction to the jury.

We next address defendant's argument a remand for resentencing is required because the judge erred in weighing the aggravating and mitigating factors. We disagree.

A-0898-19

Trial judges have broad sentencing discretion as long as the sentence is based on competent credible evidence and fits within the statutory framework. State v. Dalziel, 182 N.J. 494, 500 (2005). Judges must identify and consider "any relevant aggravating and mitigating factors" that "are called to the court's attention[,]" and "explain how they arrived at a particular sentence." State v. Case, 220 N.J. 49, 64-65 (2014) (quoting State v. Blackmon, 202 N.J. 283, 297 (2010)). "Appellate review of sentencing is deferential," and we will not substitute our judgment for the judgment of the trial court. Id. at 65. Further, our review of sentencing decisions is "is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010).

Defendant was convicted of the lesser included offense of reckless manslaughter and acquitted of murder and weapon charges. He was sentenced to eight years in prison, subject to an eighty-five percent parole ineligibility period pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. In imposing the sentence, the judge provided a detailed analysis and made specific findings in support of the aggravating and mitigating factors. The judge found aggravating factors nine (the need to deter) and twelve (victim over sixty years old). N.J.S.A. 2C:44-1(a)(9) and (12). The court then found mitigating factors three (strong provocation), seven (no prior criminal record), eight

(circumstances unlikely to reoccur), and nine (good character). N.J.S.A. 2C:44-1(b)(3), (7) to (9). Based on the evidence, particularly defendant's use of a knife during a fist fight, the judge concluded the aggravating factors outweighed the mitigating factors. The applicable factors, as weighed by the judge, were supported by the evidence and we discern no basis to disturb the sentencing determination.[4]

Finally, defendant argues the cumulative prejudice of the errors he raises deprived him of a fair trial and warrant reversal. Cumulative error occurs "where any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that defendant was not accorded a fair trial, it becomes the duty of [the reviewing] court to reverse." State v. Orecchio, 16 N.J. 125, 134 (1954) (citing State v.

---

[4] Defendant suggests the judge could have downgraded the offense and imposed a sentence in the third-degree range but for the judge's improper evaluation of the aggravating and mitigating factors. However, downgrading is appropriate only when the trial court is "clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands . . . ." N.J.S.A. 2C:44-1(f)(2). See also State v. Megargel, 143 N.J. 484, 501-02 (1996) ("The decision to downgrade a defendant's sentence 'in the interest of justice' should be limited to those circumstances in which defendant can provide 'compelling' reasons for the downgrade."). Here, defendant failed to demonstrate any compelling reasons to support a decision to downgrade the offense.

<u>Briggs</u>, 84 Minn. 357, 362 (1901)).  "[T]he theory of cumulative error will . . . not apply where no error was prejudicial, and the trial was fair."  <u>State v. Weaver</u>, 219 N.J. 131, 155 (2014) (citing <u>State v. D'Ippolito</u>, 22 N.J. 318, 325-26 (1956)).

Having rejected defendant's argument any reversible error occurred during trial, we reject his cumulative error argument.  Based on our review of the record, defendant received a fair trial and the jury's verdict is supported by the evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION