STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. GERUE SULLIVAN AND JOSEPH AIKEN, DEFENDANTS, AND GEORGE TAYLOR AND RICHARD GARNER, DEFENDANTS-APPELLANTS.

Argued June 1, 1964—Decided July 22, 1964.

214

*Mr. Warren Brody* argued the cause for defendant-appellant George Taylor.

*Mr. Sam Weiss* argued the cause for defendant-appellant Richard Garner (*Mr. Joseph J. Higgins,* attorney).

*Mr. George Perselay,* Assistant Prosecutor of Union County, argued the cause for plaintiff-respondent (*Mr. H. Douglas Stine,* Prosecutor of Union County, attorney).

The opinion of the court was delivered by

FRANCIS, J. On February 21, 1962 at about 1:50 A. M. Lester Drew was shot and killed in a small hotel owned by him in Elizabeth, New Jersey. According to Mrs. Drew, who was present at the time, the killing took place in the course of an attempted robbery. The police were notified by telephone as soon as the gunman and his companion or companions left the building. Within a few minutes, as police officers were proceeding to a designated location to assist in establishing a roadblock, they saw a red and white automobile containing four men and traveling at about 20 to 25 miles an hour. They began to follow it. As they did so, it speeded up to 35 to 40 miles per hour. A second police car appeared, cut off and stopped the pursued car. The officers alighted and as they approached, the car started to back up, then stopped again. As they neared it they heard a voice say, "Don't shoot, I got the guns," or "Don't shoot, I've got both guns."

The men in the car were Gerue Sullivan, Joseph Aiken, George Taylor and Richard Garner; Taylor was the driver. They were arrested and they and the car were searched. Two guns, one of them a pearl-handled revolver, were taken from Sullivan. A toy pistol with fresh blood on it was found under the right rear seat. Garner had been sitting there and when arrested his right wrist was bleeding, apparently from an old laceration which had reopened. The men were taken to headquarters where, within a very short time, Aiken, Sullivan and Taylor confessed they had planned with one Hilliard Brown to rob Drew, and they were attempting to do so when Sullivan shot and killed him. Aiken's confession implicated Garner as a participant in the fatal attempt. He did not involve him as one of the original planners of the crime, but as joining the enterprise on the night of its attempted execution.

Murder indictments were returned against the four men, counsel were assigned and the matter set down for trial on October 15, 1962. At the outset of the trial and before the jury impaneling had begun, counsel for Sullivan and Aiken applied to the court for leave to withdraw their not guilty

pleas and to enter pleas of *non vult* to the indictments. Before accepting the pleas, the court examined each of the two men at length to satisfy himself that they fully understood the nature, significance and consequences of their request, and that no promises or agreements had been made with respect to the sentence to be imposed. Both Sullivan and Aiken told the court they had discussed the nature and significance of the plea with their attorneys and understood (1) that a *non vult* plea is the equivalent of a plea of guilty for purposes of sentence, (2) that if the court accepts the plea it has the authority to sentence and nothing remains but the imposition of sentence, and (3) that the sentence could be either life imprisonment or a sentence to State Prison for a term of not more than 30 years. They also advised the court specifically, in answer to his questions, (1) that no promises had been made to them by the prosecutor or anyone else with respect to sentence as an inducement to enter the plea, (2) that no one had exerted any force, duress or compulsion of any kind to induce them to enter the plea, (3) that the pleas were being offered by them freely, voluntarily and understandingly in all respects, and (4) that each of them had discussed with his attorney all of the matters mentioned before the morning of trial. The court inquired of their attorneys if the defendants had filled out and signed the form used in such plea cases which contains substantially the same questions as those put by him in open court. He was told it had been done. The prosecutor then asked each of the two defendants if he understood all the questions appearing on that form. Each said he understood and had no questions to ask about it.

In addition to the inquiry by the court and prosecutor, counsel for Aiken made a long statement in his presence to the effect that they had discussed the matter at length, that Aiken understood and intended that the plea of *non vult* be considered "an admission of the commission of the offense" charged in the indictment. Counsel added, "I say in the presence of the defendant that there have been no promises made to him by anyone to induce this plea," and that Aiken did not

execute the form referred to by the court until counsel was satisfied from their discussion Aiken did so freely, voluntarily and understandingly.

After the questioning was completed and the prosecutor recommended acceptance of the pleas, the court announced he was satisfied the defendants understood fully the action they were taking and its significance and therefore he would accept the pleas.

The trial thereupon proceeded against the remaining defendants. Sullivan and Aiken were called as witnesses by the State. At its conclusion the jury found Taylor and Garner guilty of murder in the first degree and recommended life imprisonment. In due course that sentence was imposed. Sullivan and Aiken also were sentenced to life imprisonment on their pleas of *non vult*.

Shortly after the sentencing Sullivan and Aiken recanted their confessions and their testimony at the trial saying there had been no plan to rob Drew. Instead they alleged they had visited him to collect money due from him and the shooting fracas had been precipitated by Drew in the course of his refusal to pay the debt. They maintained also that Taylor and Garner had no part at all in the affair, and that they had lied about the planned and attempted robbery and about Taylor's and Garner's participating in it. Relying on the recantation, the convicted defendants moved for a new trial. After a full hearing the trial court denied the motion.

Both defendants have appealed directly to this Court as of right. *R. R.* 1:2–1(c). A number of trial errors respecting the admission or rejection of evidence, the charge of the court and the denial of certain motions, including the refusal to grant a new trial, are presented as the basis for reversal. In addition to the briefs filed by Garner's attorneys, he has submitted a memorandum alleging further grounds for a new trial. In reviewing the convictions we have given consideration to all assertions of error.

I.

Barbara Drew, wife of the victim, testified that at about 1:50 A. M. on February 21, 1962, a man came into the Lester Hotel and requested a room for two nights. She told him there was a room available but just for one night. At this, the man grabbed her with his left hand, produced a pistol with his right hand, and said it was a holdup. They had walked to the rear of the building where the Drew apartment was located when Lester Drew appeared. He, too, was told it was a holdup. At this point Mrs. Drew said she saw another person standing across the room. She could not identify him but she did hear him say, "He will kill you." Then "the guns" began to fire. Her husband slumped to the floor and the gunman ran out the same door he used to enter. She could not say if her husband had a gun, but she recognized one revolver produced at the trial as belonging to him and to her. As soon as the men left, she called the police.

Mrs. Drew's sister, Miss Jeanette Merriweather, was staying at the hotel at the time. Her room was on the same floor, near the hotel office and close to the Drews' quarters. She was awakened by a scuffling noise, got up and opened her door. She heard shots and closed the door again until the shooting ended. Then, as she heard her sister call, she opened the door and saw two men run or bump into each other near the office desk. She saw a hand of one of them "go up" to the nearby Venetian blind, the inference being that he had been knocked off balance. A hat fell off one of them as they collided. (It later proved to be Aiken's hat; and, as has been noted above, when Garner was arrested his right wrist was bleeding from an old infected and unhealed laceration which had reopened, and there was fresh blood on the toy pistol found underneath the seat of the car where he was sitting.) Neither Mrs. Drew nor Miss Merriweather could identify any of the men.

There is no doubt Aiken and Sullivan were potent witnesses for the State. If the jury believed them, there was ample basis for the conviction of Garner and Taylor.

According to Sullivan, sometime in February 1962 he, Aiken, Taylor and Hilliard or Helius Brown discussed holding up Drew at his hotel. On that occasion Sullivan, Aiken and Brown drove to the vicinity and Aiken went in and looked the hotel over. Taylor did not accompany them but it is clearly inferable from all the proof that he was aware of the criminal proposal before the night of the attempted robbery. Furthermore, Aiken testified he, Sullivan and Taylor had discussed it about two or three weeks earlier.

On the night of February 21, Sullivan said Taylor (whom he had met about four years earlier) came to his apartment in New York and asked if he was ready to go to Elizabeth. Taylor had driven to Sullivan's apartment in a borrowed car. Aiken had accompanied him but apparently stayed with the car while Taylor went in. Sullivan produced a revolver, loaded it in Taylor's presence, put it in a small paper bag and handed it to him. When Sullivan and Taylor came out, the three men talked about borrowing some money. While they were talking Taylor had the gun out of the bag. Then he put it back in the bag and hid it under the hood of the car. As will appear hereafter, Taylor denied any knowledge of the gun. He admitted, however, receiving a "package" from Sullivan who asked him to hide it, hinting that it contained narcotics. After this they drove to a bar where Sullivan met Garner whom he had known for about five months. With Garner's assistance, four dollars were borrowed and given to Taylor to pay for gasoline and tolls. Sullivan invited Garner along so he could get the money back. He testified he told Garner he was going "to pick up some money in Jersey from a girl." And he said he did not inform Garner at any time about the intended holdup.

Sullivan and Aiken are at odds about Garner's participation in the holdup. Aiken, who had never met Garner before, testified in this connection that when Sullivan encountered Garner in the bar, he brought him out to the car where Taylor and Aiken were sitting. Aiken told him they had "a job to do over in Elizabeth"; they were going to hold up Lester Drew,

and he asked if Garner wanted to go along. Garner said, "Sure, I will go." It was after this conversation that Garner borrowed the four dollars for transportation expenses.

The four men proceeded to Elizabeth and parked the car near Drew's hotel. Taylor retrieved the gun (he said "package") from its hiding place. He gave it to Sullivan who removed it from the bag and put it in his overcoat pocket. Under the plan, according to Sullivan, he was to go into the hotel first and Aiken was to follow him. If there were a number of people inside he would leave in time to stop Aiken from entering. Sullivan testified he entered the hotel and grabbed Mrs. Drew, as she said, announced the holdup, and pushed her toward the rear of the building. Drew appeared with a gun and fired. There was an exchange of shots and Drew fell. Sullivan pushed Mrs. Drew aside, wrenched Drew's gun from his hand and ran out, using the door through which he entered. It is obvious from his testimony that he left alone and did not bump into anyone in or near the office while doing so. He ran to the car and seeing the other three men there, he said, "Let's go, I have shot that man." Taylor drove off and was heading toward Newark when they were apprehended.

While Sullivan was on the witness stand, he identified the hat found on the floor of the hotel office as having been worn that night by Aiken. He also identified several pieces of cord as having been carried by Aiken to be used to tie up persons in the hotel.

Aiken corroborated Sullivan that Taylor was in on the planning of the crime and its execution. Unlike Sullivan, however, Aiken plainly involved Garner as a participant who joined them the night of the crime with full knowledge of what was going to happen. According to Aiken, when they arrived near the hotel, Sullivan left the car carrying the pistol. He walked to the hotel with Garner and Aiken 25 to 30 feet behind. When the latter two entered Sullivan was already inside. Aiken saw the shooting take place. When the shots were fired they rushed to get out, Aiken going for a

window and then for the door; Garner heading for the door. In the process Aiken's hat fell off. He pointed it out in a police photograph taken later at the scene, and then identified the hat itself which was put in evidence by the prosecutor. He admitted carrying the cord (also put in evidence) to be used in tying up Drew; and he identified a bag which had been brought along to carry the loot.

The testimony of Sullivan and Aiken was attacked sharply on cross-examination. Although some conflicts appeared, chiefly as to Garner's participation, in the main their version of the criminal event withstood the attack, certainly to the extent that the issue of their credibility was for jury appraisal.

Both Sullivan and Aiken had criminal records. Sullivan had been convicted of theft, forgery and two gambling offenses. Aiken's convictions were for robbery, narcotics (the specific nature not disclosed) and for violation of lottery or numbers statutes. These records were exposed on direct and cross-examination. In addition, both men were cross-examined about their *non vult* pleas and whether they had been told what their sentence would be. Each one indicated he had no specific knowledge or agreement on the subject. Sullivan was aware the sentence "can go up to life; I can get life." Aiken said the judge told him he "could get life up to 30 years." Obviously to aid an attack on their credibility, the interrogation was designed to discover if a reward in the way of a modest sentence had been promised or was hoped for in return for their agreement to testify against Garner and Taylor.

Taylor argues on this appeal that his cross-examination of the two men on the subject of agreed reward or hope of reward in the matter of sentence was unduly restricted. Our examination of the record reveals no prejudicial error in that regard. It may be noted also that the trial judge charged the jury as to the credibility of Sullivan and Aiken strictly and clearly in accord with *State v. Spruill*, 16 *N. J.* 73 (1954), and *State v. Begyn*, 34 *N. J.* 35 (1961). He instructed them that the testimony should be given close scru-

tiny in order to determine if either Sullivan or Aiken was influenced in giving it by the strong motive of hope of favor or pardon. He said also the fact that one who has admittedly participated in a criminal offense has turned State's evidence naturally affects injuriously the credibility given to his testimony. And he concluded by telling them to scrutinize the testimony of Sullivan and Aiken and assess it in the light of their interest, if any, in the outcome of the case. Under the circumstances, we find no error in the court's handling of the problem of their veracity as it might be affected by their willingness to appear as prosecution witnesses.

Within a few hours after his arrest, Taylor gave a statement to the police. In the fore part of the statement he denied any knowledge of the planned holdup. His position was that he drove to Elizabeth in company with Sullivan, Aiken and Garner (whom he met for the first time that night) at Aiken's suggestion. They had been looking for a dice game in the Bronx and finding none, Aiken proposed driving to Elizabeth, not giving any reason for doing so. Taylor proceeded as Aiken directed and parked near a bar, a site selected by Aiken. The three men left the car and walked in the direction of the bar. Taylor remained. In five or ten minutes they returned and one of them suggested going to Newark. Taylor drove a short distance when the police officers were encountered, at which one of the men in the rear seat said, "Stop, stop, they got us, I just shot somebody." Until this happened Taylor said he did not know his companions had any guns or that a robbery had been planned.

The record reveals that at this juncture of the police questioning, a portion of Aiken's confession was read to Taylor. After hearing it, Taylor capitulated and agreed with Aiken's version of their planned holdup. His statement then continued in question and answer form. In substance, it admits the previous planning of the robbery and his participation in it as the driver of the car on the fatal night. When the State completed its case with respect to the voluntariness of the confession, Taylor was given the opportunity to take

the stand and deny or attack its voluntariness but he declined to do so. There being no contradictory proof on the subject, the trial judge found (out of the presence of the jury) that the statement was freely and willingly given and admitted it in evidence. If Taylor intended to contest the admissibility of his confession on the ground that it was involuntary, he should have done so at that time. *State v. Tassiello*, 39 *N. J.* 282, 292 (1963).

The State showed that after the arrests, two of the police officers took Garner to the hospital for treatment of the re-opened laceration of his right wrist. In addition he had slight lacerations on some of the fingers of the right hand. The thesis of the State in this connection was that when Garner and Aiken collided with each other in their hasty exit from the hotel, it was Garner's arm and hand which Miss Merri-weather saw fly up to the Venetian blind. And it claims an inference is justified that the old injury was reopened at that time.

Taylor contends the trial court should have granted the motion for judgment of acquittal which was made at the close of the State's case on the ground the proof was inadequate to support a conviction. There is no merit in the contention. The proof and the inferences therefrom clearly pointed to Taylor's involvement in the crime. *State v. Fiorello*, 36 *N. J.* 80, 86–91 (1961), *cert.* denied 368 *U. S.* 967, 82 *S. Ct.* 439, 7 *L. Ed. 2d* 396 (1962).

In defense Taylor denied participation in the crime. He said Aiken came to his home in New Brunswick between 5:00 and 6:00 P. M. on February 20. They watched television for a while and discussed a debt of $60 which Aiken owed Taylor. Aiken wanted to go to New York so Taylor borrowed a friend's car. In New York they looked up a friend of Aiken from whom he thought he might borrow the $60. The attempt was unsuccessful so they sought another of Aiken's friends. This one was Sullivan whom Taylor had met on one previous occasion. Taylor rang Sullivan's door bell and waited for him to come down. He denied going into the apartment or

seeing Sullivan load a gun there. On Sullivan's arrival, the three men discussed borrowing some money. Sullivan told Taylor he had a package he wanted "stashed" away because he did not want it found by narcotics detectives. The package was handed to Taylor and he hid it under the hood of the car. He testified at the trial he did not see or know what its contents were.

Thereafter they went to the bar mentioned above. Sullivan entered in pursuit of a loan and returned with Garner who finally produced four dollars from a friend of his. Then, according to Taylor, Sullivan persuaded Garner to come along to Elizabeth where he was going to borrow money from a girl. On arrival in Elizabeth, Sullivan told Taylor where to park and he did so. He insisted there was no discussion at any time about an intended holdup, and he did not know of any such plan. When they parked, Sullivan asked for the hidden package. Taylor obtained it and turned it back to Sullivan, still not knowing what it was. Sullivan and Aiken then walked in the direction of a nearby bar. He and Garner remained in the car with the motor off and the radio on. He never left, and Garner left only for a few minutes to answer a call of nature. Garner returned to the car and about five minutes later Sullivan and Aiken returned, at which time Aiken suggested going to Newark. Nothing else was said until the police intervened when, according to Taylor, Sullivan yelled, "Stop the car. That is the police, they got us." Taylor said, "What do you mean, got us?" To which Sullivan replied, "A guy shot at me back there when I was away from the car and I shot back and I hit him."

With respect to his confession, the voluntariness of which had not been challenged by any affirmative evidence at the proper time in the trial, he suggested some coercion had been a factor. He testified the confession was drawn like Aiken's because one of the detectives accused him of lying, said he did not want "to get rough with him" but his statement had to conform to Aiken's. Thereafter he went along with what-

ever the detective "put down." He was tired and nervous and did not read it very well before signing.

Neither before Taylor took the stand nor at the conclusion of his testimony was there a suggestion that an attack was being made on the voluntary character of his confession. No reason was advanced why, if its voluntariness was in question, the supporting evidence was not offered at the proper time in the trial. When such an issue is to be raised, the long established procedure for handling the admissibility of confessions must be followed. Counsel cannot be permitted for tactical reasons to withhold such evidence when the "trial within a trial" of the competency of the confession takes place, and then after the court has ruled the statement admissible, seek to present the allegedly contesting proof during the defense. As we said plainly in *State v. Tassiello,* a defendant should not be allowed to withhold the proof and offer it later as part of his defense, except for some extraordinary reason which appeals to the trial judge's discretion and sense of justice. 39 *N. J.,* at *p.* 292, *fn.* 2.

There was no motion at the end of Taylor's testimony or at the end of the case to strike the confession from the record as involuntary. Study of all the evidence gives the impression the defense was primarily interested in assailing the credibility of the confession rather than its voluntariness. In any event, the trial court's finding of voluntariness is not directly attacked on this appeal, and we have no occasion to interfere with that finding. The ultimate decision as to voluntariness was left to the jury in the court's charge, and we find no basis for criticism of the manner in which the jury was instructed on the subject. Moreover, on the issue of credibility, it may be noted that Taylor had two previous convictions of crime, one for grand larceny and the other for breaking and entering. Aside from any possible adverse effect the convictions might have had on his veracity, there is serious doubt that a jury would have considered his explanation of the confession plausible. Aiken had inculpated himself in a felony murder, an offense punishable by death.

Taylor said he agreed with Aiken's confession which clearly involved him also, because Aiken was "a good friend" and "I didn't figure I was involved in nothing. I didn't want to say nothing to hurt him no kind of way, that is why I went along with it. The detective say mine had to be just like his. That is why I went along with it."

■ Another circumstance which a jury might well have regarded as reflecting adversely on Taylor's veracity was his testimony about the handling of Sullivan's gun on two occasions before the holdup. It will be recalled that Sullivan had put it in a paper bag. He said when he got in Taylor's car in New York they talked a while before starting out to borrow some money. During this period Taylor had the gun out of the bag and in his hand. Taylor conceded in his testimony that they did sit in the car and talk for a time but denied seeing the gun. However, the paper bag was given to him at that time and he did hide it under the hood of his car. He handled the paper bag again in Elizabeth when he took it from the hiding place and handed it to Sullivan. Obviously a jury could sensibly believe that he must have realized in handling the paper bag that it contained a gun. The prosecutor in his summation made a point of this by picking up a paper bag in evidence (the one brought along to hold the loot) and putting the gun inside it. He asked the jury to do it in the jury room "to test the credibility" of Taylor. The trial court sustained the defense objection to the demonstration and instructed the jury to disregard the suggestion. In spite of the ruling, the prosecutor's action is made a ground of appeal. Aside from the fact that the prosecutor's demonstration and suggestion seem to be sensible and permissible argument, it cannot be that any possible error could have survived the court's stricture on the prosecutor.

In connection with guns, as has been noted above, the police found a toy pistol stained with fresh blood in the rear of the car where Garner was sitting. According to Taylor it belonged to one of his children.

Garner testified in his defense. He had given no confession of guilt after arrest. He denied acquaintance with Sullivan, Aiken or Taylor before the night of the homicide, although he had seen Sullivan around the neighborhood. All four men were in agreement that Garner borrowed the four dollars to be used as expense money for the trip to Elizabeth. Garner insisted, however, that no one told him about a planned robbery. So far as he knew, Sullivan wanted to drive to New Jersey to see "a lady friend, who had some money of his." Sullivan asked him to take the ride with them and the four dollar loan would be repaid as soon as the money was obtained from the lady friend. Garner decided to go along. He testified he had consumed six or seven bottles of ale and two drinks of whiskey that evening and, as a result, fell asleep during the trip. When he awakened, the car was standing and Taylor was the only one in it. He got out to relieve himself, returned immediately and he and Taylor were listening to a radio program when Sullivan and Aiken came back. One of them said, "Let's go" and Taylor drove away. Within a few minutes they were intercepted by the police.

There is no doubt Garner had an injured right wrist. Four or five days earlier he had been attacked and cut on that wrist. The wound was bandaged but unhealed. He admitted being taken to the hospital by the police for treatment but denied the wound was bleeding when he was arrested.

Obviously Garner's complete denial of complicity in the murder created a sharp issue of credibility between him and Aiken. And, of course, in resolving that problem, the jury was permitted to consider Garner's serious criminal record. That record consisted of two petty larceny convictions, one for carrying a concealed weapon, two for robbery, one as a parole violator, and another for some type of criminal impersonation, the exact nature of which is not clear from the testimony.

At the close of the entire case; Taylor and Garner renewed their motions for judgment of acquittal. At this time the conflict in the testimony was more pronounced than it had been

at the end of the State's proof, especially between that of Aiken and Garner. The substance of the defense argument seemed to be that the evidence against Taylor and Garner was so unworthy of belief as to require their acquittal as a matter of law. The trial court found no merit in the claim, being satisfied, and in our judgment rightfully so, that on the entire case, the factual issue of their guilt or innocence was for determination by the jury. Moreover, we concur in the view of the trial court in denying the motion for a new trial that the verdict of guilt as to both defendants was not contrary to the weight of the evidence.

## II.

Within a short time after Taylor, Garner, Sullivan and Aiken had been given the same sentence, namely life imprisonment, Sullivan and Aiken recanted their trial testimony and disavowed their confessions. Their action in that regard resulted in a motion for a new trial on the ground of newly discovered evidence.

It is entirely clear from the extensive hearing on the motion that dissatisfaction with the sentence stimulated the recantation. Sullivan and Aiken made plain their feeling that having aided the State in the prosecution of Garner and Taylor, they should have been rewarded by a lesser prison term than that meted out to the men who stood trial.

The specific nature of their recantation was astonishing. They said there was no plan to rob Drew, no attempt to rob him, and that the killing did not take place during an attempted robbery. According to the new version of the incident, Drew was in the lottery or numbers business and Aiken was a runner for him. Sullivan played a number with Aiken who placed the bet with Drew and the number won, entitling Sullivan to $1,200. Thereafter Aiken visited Drew on two or three occasions before February 20 to collect but Drew had put him off saying the money would be available in two or three days.

Aiken testified that on the night of the shooting, he and Sullivan came to New Jersey in Taylor's car in order to collect from Drew. He wanted Sullivan along so that if Drew did not pay, Sullivan would realize the failure was not chargeable to him. Garner, he said, simply came along for the ride and to recoup the four dollar expense loan. When they arrived in Elizabeth near the hotel, he and Sullivan went in; Garner and Taylor stayed in the car. On entering, they met Mrs. Drew who called her husband. He appeared with a gun in his hand and said, "I'm not going to pay either of you two punks nothing." Drew fired and Aiken ran, leaving Sullivan in the hotel.

In his recanting testimony, Sullivan corroborated Aiken about the purpose of their visit to Drew. Earlier in the evening he had stopped at a bar to have a drink with a friend who was drunk. A gun fell out of the friend's belt. Sullivan picked it up and decided to hold it for the friend because of his condition. Sullivan took the gun home, put it in a "neat package" in a paper bag and deposited it in his overcoat pocket. Taylor did not come into the apartment nor see him load the gun. Later, when he went out to Taylor's car, he asked Taylor to "stash" the package away, pretending it was narcotics. Before he went into the bar where he met Garner, he had Taylor return the package to him. He threw the bag away and put the gun in his pocket. He intended to return it but discovered the owner was not there.

When he and Aiken went into the hotel and spoke to Mrs. Drew, Lester Drew appeared with a gun in his hand, as Aiken had said, and told them to get out. He fired, and Sullivan and Aiken started to run. Sullivan then grabbed Mrs. Drew and drew his gun and shot at the floor. Drew fired again hitting the cylinder on Sullivan's gun causing it to go off. The bullet struck Drew and he fell. Sullivan took the gun from Drew's hand and left the hotel.

Both Aiken and Sullivan testified they signed their confessions in fear because they had been threatened with beatings. They pleaded *non vult* and testified against Taylor and Gar-

ner because they had been promised light sentences; Aiken said 5 to 7 years or, at most, 7 to 10 years; Sullivan said less than 15 years. All of the testimony they gave at the trial involving themselves and Taylor and Garner in a criminal homicide, they now say they did not commit, was allegedly due to the promises about the sentences. And they said they were told if they departed at the trial from their statements involving the other two men, the *non vult* pleas would be taken away from them.

Aiken testified that his assigned counsel, Edmund J. Kiely, was not present when the assistant prosecutor and the lieutenant of prosecutor's detectives made the promises about the sentence. He said also that he kept the promises to himself because all Kiely wanted him to do was plead guilty. He alleged he told Kiely that the trip to the hotel was to collect the numbers money, but was advised no one would believe him and it would be best to plead guilty.

Mr. Kiely testified his client never told him the statement he gave to the police was false. On the contrary, on one occasion when Kiely and Aiken met with the prosecutor's representatives who are charged with making the promises, Aiken repeated to the assistant prosecutor substantially the facts appearing in the confession. According to Mr. Kiely, Aiken was told "any number of times" at this conference that no promises could be made but that the assistant prosecutor would speak favorably for him at the time of sentencing. (The record shows the assistant prosecutor kept his word in that respect.) Kiely said Aiken was most anxious, as he put it, "to cop a plea" and several times expressed the hope he would receive 25 to 30 years. Moreover, Aiken never showed any reluctance about testifying against the other defendants, and never told Kiely he had come to New Jersey to collect Sullivan's numbers winnings from Drew. It appeared also during the questioning that Aiken had written Kiely three times since the sentencing and on one occasion had thanked him for saving his life.

Sullivan's assigned attorney, Cuddie E. Davidson, Jr., testified Sullivan never denied to him either the voluntariness of his statements to the police, or the version of the crime set out therein. No other account of the killing was ever mentioned by Sullivan, and particularly, he never asserted he came to Elizabeth to collect a gambling debt. Mr. Davidson denied that Sullivan had been promised a 15-year sentence in his presence, or that any promises had been made in return for the giving of testimony for the State.

Drew's widow was recalled as a witness. She repeated her original testimony about the circumstances of the shooting. Also, she denied ever having seen Aiken before or that he ever came to see her husband.

Police officers who participated in taking the various statements from Aiken and Sullivan testified. They denied making threats of bodily injury in order to force admissions of the crime. On the contrary, according to them, the defendants were calm, resigned and cooperative as they talked about the killing. A polygraph operator appeared as a witness. He said both men told him they had come to Elizabeth to commit a robbery; no other reason was given.

Lieutenant Stephen McGlynn of the prosecutor's office was with the assistant prosecutor when the alleged light sentence promises were made. He denied any such promises were made. McGlynn also saw Aiken and Sullivan making their statements. He denied the confessions were obtained as the result of force of any kind. (The assistant prosecutor referred to had suffered a severe illness and was not called as a witness at this hearing.)

After the recantation and the motion for a new trial, but before the hearing, McGlynn visited the men at State Prison. At that time, among other things, they said they were dissatisfied with their sentences, and that they were going to lie in court on the motion. Both said they had already received life sentences, so the lying did not matter.

The rule in this State as to the quality of proof necessary to warrant a new trial on the ground of newly

discovered evidence is well settled. The alleged new facts must be material to the issue, and not merely cumulative, or impeaching; they must have been discovered since the original trial and not discoverable prior thereto by the use of reasonable diligence; and finally, their probative force must be such as to persuade the discretion of the trial court that if introduced at a new trial, a contrary verdict ought to result. As to the last element, the test is probability, not possibility. *State v. Artis*, 36 *N. J.* 538 (1962); *State v. Smith*, 29 *N. J.* 561, 573 (1959).

After a detailed analysis of the evidence offered on the motion, the trial court found the statements of Sullivan and Aiken to be "a post conviction fabrication, not worthy of any credibility." Our own study of the record has led us to the conclusion that the evidence amply supports his finding. More specifically, we agree that the recanting testimony, when viewed against the background of the confessions of Sullivan and Aiken, their *non vult* pleas, their testimony at the trial and particularly the statements of the reputable counsel who had been assigned to defend them, does not demonstrate with any degree of persuasion that they falsely branded themselves as murderers at the trial, and by that perjury willfully brought Garner and Taylor into the shadow of the electric chair. Accordingly, on the record now before us, we find no error in the denial of a new trial. *State v. Artis, supra; State v. Smith, supra; State v. Bunk*, 4 *N. J.* 482, 19 *A. L. R.* *2d* 1316 (1950).

### III.

Both defendants charge error in the answer given by the trial judge to a question submitted by the jury while they were deliberating on their verdict.

After the jury had been out for some time, they sent a note to the court containing two questions. Only one of the questions is involved here. On receipt of the note, the court had the jury returned to the courtroom where the following colloquy took place:

"THE COURT: Mr. Foreman, and ladies and gentlemen of the jury, the Court has received your note propounding your two questions. There is some uncertainty in the Court's mind about one of the questions. I am going to answer both of them, and then I am going to make an inquiry to which I ask that only your Foreman respond in order that the Court may supplement its original answer to the question, if it determines in the light of that response by the Foreman that it is necessary.

The first question the Court has is:

'After having pleaded non vult is there any reason why Sullivan and Aiken should expect their testimony in this case to have any effect on their sentence?'

Interpreting it as the Court does, the Court responds that it knows of no reason why Sullivan and Aiken should expect their testimony in this case to have any effect on their sentence.

\* \* \* \* \* \* \*

Those are the Court's answers to your questions, but there is a possibility that on question number one the Court misinterpreted the purport of your question, and I ask your Foreman whether or not there is any doubt in the minds of the jury on the manner in which it should evaluate the testimony of persons in the status of Sullivan and Aiken. Is there Mr. Foreman?

THE FOREMAN: No, sir. I think you answered it very well."

After the jury retired, one defense counsel moved for a mistrial saying the court should have told the jury the question "whether the court knows or does not know what the effect of the testimony of these witnesses will have on their sentencing" is "irrelevant." The other defense counsel joined in the motion and added that the court should not have taken the answer of the foreman of the jury alone, but should have provided an opportunity for the rest of the jurors to discuss the matter before sending them back to resume their deliberations. In fact, one counsel suggested the jury should have been polled as to whether they understood and were satisfied with the court's answer to the question.

Defendant Garner claims that when the question was answered, it was error for the court not to have repeated his original cautionary instruction to the jury which was given in accordance with *State v. Spruill, supra.* More specifically, the suggestion is that the court should have told the jury again they should scrutinize the testimony of Sullivan and Aiken closely to determine whether it was influenced by a

strong hope of favor or pardon. Since nothing was said by the court in answer to the question indicating in the slightest any withdrawal of, or qualification on, the original cautionary instruction, we cannot regard omission of the repetition as error. This is particularly so since the foreman, by his answer to the court's question, advised there was no doubt in the minds of the jury "on the manner in which it should evaluate the testimony of persons in the status of Sullivan and Aiken." That the reference was to the original cautionary charge is beyond question. Moreover, no reversible error came into being because the individual jurors were not polled or given an opportunity to consult with each other as to the sufficiency of the court's answer to their question. Obviously their silence may be taken to reveal their agreement with the foreman's statement. That they did so agree is further indicated by the fact that after resumption of deliberations, no further questions were propounded on this score.

Taylor urges somewhat differently that the trial judge's answer, in conjunction with his improper limitation on the cross-examination of Aiken and Sullivan as to their understanding of what the sentence would be, compounded the original harm done by the restriction on the questioning and thus caused prejudicial error.

In the cross-examination referred to, both men made plain there was no understanding or idea as to the exact sentence. Both knew it could be life imprisonment. Aiken said it could be 30 years to life, and in somewhat awkward language indicated his understanding to be that it would be "a fair justice."

The obvious does not have to be emphasized. No one can doubt these men hoped they would receive some favorable consideration in the matter of sentence because they had admitted their own guilt in the murder and had become State's witnesses. It would be unnatural if they did not entertain such hope. The court properly assumed such a state of mind existed in cautioning the jury they should consider whether the "strong motive of hope of favor or pardon" influenced

Sullivan and Aiken to testify falsely in whole or in part against Taylor and Garner. Although this Court has expressed the view that it is proper in such cases to inquire into the possibility that hope of reward had colored the accomplices' testimony, *State v. Curcio,* 23 *N. J.* 521 (1957), we see no such prejudicial curtailment of the right of inquiry here as would warrant reversal of the convictions. Nor has it been made apparent to us how the answer given by the court to the jury's question elevated the alleged curtailment on questioning to the plane of prejudice.

## IV.

Taylor alleges the trial court erred in charging the jury that proof of one's presence at the scene of the crime without disapproving or opposing its commission is evidence of guilt. The error is said to lie in the fact that Taylor was not in the hotel at the shooting but some distance away sitting in the car. But in making the point, not only is the exact language of the charge omitted, but the paraphrase is taken out of context as well.

The court explained clearly and in detail the significance of aiding and abetting. The portion of the charge was general in character and clearly helpful to the jury. Among other things, he said:

"The phrase 'aid and abet' comprehends all assistance rendered by words, acts, encouragement, support or presence, actual or constructive, to render assistance if necessary. Mere presence at or near the scene does not make one a participant in the crime, nor does the failure of a spectator to interfere make him a participant in the crime. It is, however, a circumstance to be considered with the other evidence in determining whether he was present as an aider and abettor, but it is not in itself conclusive evidence of the fact. To constitute guilt there must exist community of purpose and actual participation—an aiding and abetting in the crime committed.

*While mere presence at the scene of the perpetration of a crime does not render a person a participant in it, proof that one is present at the scene of the commission of the crime without disapproving or opposing it, is evidence from which, in connection with other circumstances, it is competent for the jury to infer that he assented thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same.*" (Emphasis added)

The trial judge went on to say a person cannot be an active partner in the intent which is the crime's basic element without actual knowledge of the planned criminal activity. There can be no criminal responsibility without that knowledge and the necessary community of purpose.

The italicized language presumably is the portion challenged. There is no mention of Taylor in the paragraph and in the framework of the entire charge we perceive no cause for complaint about the court's discussion of aiding and abetting. See *State v. Churchill,* 105 *N. J. L.* 123 (*E. & A.* 1928) ; *State v. Giberson,* 99 *N. J. L.* 85 (*E. & A.* 1923) ; *State v. Marshall,* 97 *N. J. L.* 10 (*Sup. Ct.* 1922) ; *State v. Carlino,* 98 *N. J. L.* 48 (*Sup. Ct.* 1922), affirmed 99 *N. J. L.* 292 (*E. & A.* 1923) ; *State v. Wilson,* 79 *N. J. L.* 241 (*Sup. Ct.* 1910), affirmed 80 *N. J. L.* 467 (*E. & A.* 1910) ; *Engeman v. State,* 54 *N. J. L.* 247 (*Sup. Ct.* 1892). Of course, mere presence at the scene of the perpetration of a crime does not make a person a *particeps criminis.* To make him a party to the criminal act there must be an actual participation—an aiding and abetting in the full sense defined by the court. *State v. Fox,* 70 *N. J. L.* 353 (*Sup. Ct.* 1904). Defendant's paraphrased portion of the charge, wrenched as it is from the explanatory contest, presents no meritorious ground of appeal.

## V.

Taylor asserts it was error for the court to charge the jury on the subject of flight and its possible significance in their deliberations. The objection is based on the allegation that there was no evidence upon which an inference of flight could be predicated. The record is to the contrary.

The State's proof if believed by the jury justified the conclusion the four men came to Elizabeth to perpetrate a robbery. There is testimony also that after Drew was shot, Sullivan departed hastily, leaving Mrs. Drew with her mortally wounded husband. Undoubtedly realizing she would call the police, he ran back to the car in which Taylor, Garner and

Aiken were sitting, and said, "Let's go, I have shot that man." Taylor responded immediately by starting the car and driving off. When the police noticed their car and began to follow, Taylor was driving 20 to 25 miles per hour. As the police neared, he increased the speed to 35 to 40 miles per hour. Then a second police car appeared and cut in front of them, forcing Taylor to stop. As the officers alighted and started toward defendants, there is evidence that their car started to back up. According to Sullivan's testimony, when the police car intercepted them, he said, "Stop the car and don't run. They got us."

In view of this evidence, the trial court charged the jury:

"There has been some testimony in the case from which you may infer that the defendants fled shortly after the alleged commission of the crime. The defendants deny any flight. The question of whether the defendants or either of them fled after the alleged commission of the crime is another question of fact for your determination.

If you find that the defendants or either of them fearing an accusation would be made against them or him on the charge involved in the indictment, or arrest by reason thereof, took refuge in flight for the purpose of evading the accusation or arrest, then you may consider such flight as a circumstance which may tend to show consciousness of guilt and which should be weighed by you with all the other evidence in the case. If you find that the defendants or either of them made no effort to flee after the alleged commission of the crime, you may consider that as a circumstance which may tend to show an absence of consciousness of guilt and which should be weighed by you with all the other facts and circumstances."

The term "flight" is often misused for "departure." Departure from the scene after a crime has been committed, of itself, does not warrant an inference of guilt. Obviously there may be facts, entirely legitimate, connected with a departure which would not support such an inference at all. See *State v. Hedinger,* 126 *N. J. L.* 288, 291 (*Sup. Ct.* 1941), affirmed 127 *N. J. L.* 564 (*E. & A.* 1942). For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to

avoid an accusation based on that guilt. 2 *Wigmore, Evidence* § 276, *p.* 111 (*3d ed.* 1940) ; 1 *Wharton's Criminal Evidence* § 205, *p.* 414 (*12th ed.* 1955).

The jury instruction quoted above was not materially difference from that requested by the defendant Taylor. We can find no prejudicial error in the language employed by the court in submitting the issue of flight to the jury for consideration.

## VI.

 Both defendants argue that the trial court should have sequestered the jurors as they were selected and sworn; that he should not have waited until the full complement had been accepted before doing so. Decision on that phase of the trial is committed to the discretion of the trial judge. *R. R.* 3 :7–2 (f). The record fails to reveal an improper use of discretion in the procedure followed. Moreover, on numerous occasions as the jurors were drawn and throughout the trial, the court cautioned them not to discuss the case among themselves until all the proof was in and they had retired to deliberate upon their verdict, nor to allow anyone to discuss or attempt to discuss the case with them at any time. We have no doubt the rights of the defendants were protected fully in this regard.

 The claim is made also that the court allowed the prosecutor to put certain questions to prospective jurors in which they were asked to assume certain factual hypotheses and to say if they could or would follow the law charged by the court to be controlling in those situations. Examination of the questions reveals no impropriety. The scope and prolixity of the examination rests in the discretion of the trial court, limited only by the demands of fairness and justice. *State v. Grillo,* 16 *N. J.* 103 (1954) ; *State v. Huff,* 14 *N. J.* 240 (1954). The nature and variety of questions in hypothetical form designed to insure selection of a jury which will be intelligent, competent and impartial to both State and

defense must be left to the good judgment of the trial judge. He may be relied upon to control the interrogation if it becomes too time consuming or too extensive in its coverage. We see no legitimate ground for a finding of error in the present instance.

## VII.

On March 7, 1963 at the hearing on the motion for a new trial based on the recantation, defense counsel learned that Aiken and Sullivan had testified before the Union County Grand Jury on October 11, 1962 in connection with the involvement of Hilliard Brown in the crime. At the original trial, during the examination of Aiken and Sullivan, the assistant prosecutor was ordered by the trial judge to turn over to defense counsel for use on cross-examination "any notes or statements [of the witness] covering the subject matter of his direct testimony." The assistant prosecutor complied with the directive and there is no reasonable basis for a suggestion that he did not act in good faith. There was no reference to the Grand Jury testimony in the Brown proceeding; no one asked for it, and quite obviously, no one thought about it or deemed it included in the court's order. Under ordinary circumstances, if counsel knew of the testimony and demanded it, or if the prosecutor was aware of it, defendants were entitled to have it for purposes of cross-examination. *State v. DiModica*, 40 *N. J.* 404 (1963).

At the oral argument we directed the State to deliver the transcript of the Grand Jury testimony to defense counsel and to us for examination. After reading it, defendants assert that inconsistencies appearing therein between statements of Aiken and Sullivan at the trial and before the Grand Jury are sufficiently grave as to require a reversal of the conviction so it may be used in an attack on their credibility at a new trial. We have studied the Grand Jury testimony and compared it with the trial statements. Although the comparison reveals some conflicts, in our judgment in light

of the whole case, they are not so material in character or so prejudicial as to justify a reversal:

## VIII.

Defendant Taylor contends his motion to dismiss the indictment should have been granted since the statutes defining the crime of murder in the first degree and the punishment therefor are unconstitutional. Such invalidity is said to exist because if he is found guilty after trial, the statutes subject him to a more severe pattern of punishment than "would" have been imposed had he pleaded *non vult*. More specifically, he says the state of the law is such that if an accused under such an indictment pleads *non vult* the maximum sentence to which he is subject is life imprisonment or any term in prison up to 30 years, the maximum sentence for second degree murder. On the other hand, he says a defendant who protests his innocence of an alleged murder and goes to jury trial, if found guilty of first degree murder, faces a mandatory sentence of death, or, in the discretion of the jury after a consideration of all the evidence, life imprisonment. The argument then proceeds to its conclusion that to force such a grisly and dangerous choice on a defendant who asserts his innocence is to deprive him of due process and equal protection of the law. The words have a surface appeal but in depth and in substance they portray no basic conflict with the State or Federal Constitutions.

*N. J. S.* 2A:113–2 says that "murder * * * which is committed in perpetrating or attempting to perpetrate * * * robbery * * * is murder in the first degree." Under the rules of criminal practice, an indictment for murder is sufficient when it charges (as it did in this case) that the defendant "did willfully, feloniously and of his malice aforethought, kill and murder the deceased." *R. R.* 3:4–3(b). That short form indictment is sufficient to encompass murder in the second degree as well as murder in the first degree, *Graves v. State,* 45 *N. J. L.* 203, 206 (*Sup.*

*Ct.*), affirmed 45 *N. J. L.* 347 (*E. & A.* 1883), and manslaughter. See *State v. Guido,* 40 *N. J.* 191 (1963); *State v. King,* 37 *N. J.* 285 (1962). A plea of guilty to such an indictment cannot be received. If offered, it must be disregarded and a plea of not guilty entered. The accused may offer a plea of *non vult,* however, and if accepted by the court, a punishment of death cannot be imposed. The sentence is required to be either imprisonment for life or "the same as that imposed upon a conviction of murder in the second degree," *i. e.,* for not more than 30 years. *N. J. S.* 2A:113–3, 4. If a plea of *non vult* is not accepted, the accused proceeds to trial in the same way as in any other case involving a not guilty plea. If convicted of murder in the first degree, the punishment must be death unless the jury recommends life imprisonment in which case no greater sentence can be imposed. If convicted of second degree murder the sentence is required to be imprisonment for not more than 30 years. *N. J. S.* 2A:113–4.

In this State originally (as at common law), no degrees of murder were recognized, and the punishment was mandatory —death. *Paterson, Laws of New Jersey* 1796, *p.* 208 (*Rev.* 1800). If an accused confessed to an indictment for murder, he condemned himself to death. As a result, judges, as Blackstone put it, "out of tenderness to the life of the subject; * * * generally [advised] the prisoner to retract it, and plead to the indictment." 2 *Chitty's Blackstone, p.* 267 (1895); 4 *Blackstone's Commentaries, p.* 329; *State v. Genz,* 57 *N. J. L.* 459 (*Sup. Ct.* 1895). Later, in order to ameliorate this harsh rule, section 68 of the 1874 revision of the crimes act provided that if the accused "shall be convicted on confession in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and give sentence accordingly." *Rev. Stat.* 1874, § 68, *p.* 145. Thus, the court was given authority to determine under an indictment (in the same short form we use today) whether the offense confessed was first or second degree murder and to punish accordingly. (See, as to the form of indictment and

its constitutional propriety, *Bergemann v. Backer,* 157 *U. S.* 655, 15 *S. Ct.* 727, 39 *L. Ed.* 845 (1895) ; *Graves v. State, supra.*) It may be noted that the same section of the statute also provided that on the trial of any kind of murder charge except felony murder, the jury should designate by their verdict whether they found the defendant guilty of first or second degree murder.

The constitutionality of section 68 was attacked as violative of the Fourteenth Amendment of the Federal Constitution when the court, after hearing evidence on a plea of guilty, found murder in the first degree and imposed the death sentence. It was argued that due process prevented the condemnation of a person without trial by jury. The argument was rejected, the court saying the right of the accused to a jury trial was not affected. A proceeding to determine the degree of murder after a plea was said not to be a trial, and no provision appears in the Constitution which prevents a defendant from pleading guilty to the indictment instead of having a trial by jury. If he elected to plead guilty, the provisions of the statute for determining the degree of guilt and fixing the punishment did not deprive him of any right of trial by jury. *Hallinger v. Davis,* 146 *U. S.* 314, 13 *S. Ct.* 105, 36 *L. Ed.* 986 (1892).

In 1893 the authority of the court to impose the death sentence on a plea of guilty was withdrawn. Section 68 of the Revision was altered so as to ban a plea of guilty and to authorize the court in its discretion to accept a plea of *non vult* in which event "the sentence to be imposed * * * shall be the same as that imposed upon a conviction of murder of the second degree." *L.* 1893, *c.* 36.

At this time the punishment for first degree murder was death. There was no provision for a sentence of life imprisonment. Second degree murder was punishable by imprisonment at hard labor for not less than five years nor more than twenty years. *Rev. Stat.* 1874, § 69, *p.* 145.

The constitutionality of the 1893 act was assailed in *State v. Genz, supra.* Genz was indicted for murder. On arraign-

ment he pleaded guilty. The court refused the plea and entered a plea of not guilty. The prosecutor moved the case for trial and, on defendant's objection, the trial court sought an advisory opinion from the Supreme Court.

Defendant contended the act and the procedure established thereby which authorized the trial court to disregard his plea of guilty and put him to trial, were invalid because they deprived him of his right to confess his guilt or to put in his plea to that effect and thus make himself eligible for a second degree murder sentence. Chief Justice Beasley, speaking for the Court, referred to the specific rights and guarantees of the criminal granted by the Constitution, and said that none of them lent the least support for the right asserted. He expressed the view that the statute was altogether favorable to the accused, saying:

"Common law procedures, as such, are plainly not inviolable. Many of them have been abolished, and most of them have been modified by legislation. They must receive a constitutional impress before it can be said that they stand above the reach of the lawmaker. If we were, therefore, to concede that, by force of the ancient English system, the defendant in a criminal arraignment was permitted to confess his guilt in open court, and that such right was advantageous to him, there seems not the faintest reason for a contention that such right could not be abrogated or modified at the legislative will.

But, in point of fact, the faculty of the prisoner to confess his crime in open court when charged with murder was never at common law a serviceable prerogative. The procedure merely provided a ready and facile road to the gallows. In form, the indictment always charged the crime of murder; and consequently, if the plea confessing guilt was put in, as an immediate and inevitable consequence the sentence of death was pronounced. It seems quite fantastical to contend that such a course of law as this is of such inestimable value to the prisoner that the legislature cannot deprive him of it." 57 N. J. L., at p. 462.

The 1893 amendment was continued intact in the 1898 revision of the crimes act. L. 1898, c. 235, § 107. But, in 1916, following agitation for abolition of the death penalty, section 108 of the 1898 revision was amended to provide that every person convicted of murder in the first degree shall suffer death unless "the jury at the time of rendering the

verdict in such case shall recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed." *L.* 1916, *c.* 270; 2 *Schlosser, Criminal Laws of New Jersey*, § 1380, *p.* 656 (*Rev. ed.* 1953). Section 108 was amended in 1919 to substantially its present form, *i. e.*, that a person convicted of murder in the first degree shall suffer death unless the jury by its verdict, and as part thereof "upon and after consideration of all the evidence," recommends imprisonment at hard labor for life. *L.* 1919, *c.* 134. The present form simply omits the specification of hard labor. *N. J. S.* 2A:113–4. Under the 1898 revision, punishment for second degree murder was imprisonment not exceeding 30 years. It has remained the same to the present time. *Rev. Stat.* 1898, § 108; *L.* 1916, *c.* 270; *N. J. S.* 2A:113–4.

 It can be seen from the evolution of our present crimes act that the Legislature has gradually ameliorated the harshness of the common law treatment of persons convicted of murder. As a result the law has proceeded from the mandatory death penalty in all types and degrees of murders to a humane vesting in the jury of discretion, even where guilt of first degree murder is found, to decide whether the death penalty or life imprisonment should be imposed. Also, the jury is required, except in felony murder cases, *State v. Zeller*, 77 *N. J. L.* 619 (*E. & A.* 1909), to determine and designate by its verdict whether the finding of murder is in the first or second degree. *N. J. S.* 2A:113–2. Even in cases where the thesis of the State's prosecution is felony-murder, if a factual issue arises as to whether the killing was a felony or nonfelony murder, the jury must be instructed that a finding of nonfelony killing must be accompanied by a designation of first or second degree murder.

██ The evolution of the sections of the crimes act dealing with murder and its punishment makes it plain that an accused has no right, constitutional or statutory, to plead guilty and insist upon acceptance of the plea. Moreover, the court has no authority to accept such a plea. The obvious intention of the Legislature in imposing that limitation is to

remove the death penalty from the court's control. The defendant may, however, elect to offer a plea of *non vult* to the indictment. Acceptance is discretionary with the court. It is a matter of grace. Undoubtedly there are many considerations which may move the judge's discretion. He may consider the crime so heinous that the public interest requires a determination by a jury with respect to the death penalty. Experience seems to indicate that his problem is most difficult in felony-murder cases. There is no doubt he gives substantial, though not controlling, consideration to the views of the prosecutor. It is likewise obvious that a moving factor may be information that the accused intends to testify for the State against his accomplices in the criminal event; particularly is this true where the State's case is difficult of proof without such assistance. Indeed, it has been said to be the policy of the law to invite such persons to come forward and expose participants in their guilt, whether undiscovered or indicted with them. *State v. Hyer*, 39 *N. J. L.* 598, 601 (*Sup. Ct.* 1877).

Not only is there no right to demand acceptance of a plea of *non vult,* but acceptance thereof by the court confers no right to any particular sentence short of life imprisonment. As *N. J. S.* 2A:113–3 prescribes, the term may be for life or for any period up to the 30-year maximum for second degree murder. One reason for the broad expanse of sentencing power is the nature of the indictment. As we have said, it specifies no degree of murder, and will support a conviction of first or second degree murder or manslaughter. (We note in passing it has been suggested persuasively that there is nothing in our rules or statutes which prohibits a specific indictment for second degree murder in a proper case.) Under our cases the plea must be to the indictment. It should not be to a specific degree of murder. Nor does the statute, as in earlier days, contemplate a hearing to determine the degree of guilt or the nature of the sentence to be imposed. *State v. Williams*, 39 *N. J.* 471, 479 (1963). Sentence is passed by the court within the broad limits authorized, after considera-

tion of the nature of the offense and a comprehensive pro-
bation report. *R. R.* 3 :7–10 (b).

In view of all the foregoing, we can find no support for
the claim that Taylor was treated unfairly, or discriminated
against or denied due process or equal protection of the law.
He exercised his absolute right to have his guilt or innocence
tried by a jury. He did not elect to offer a plea of *non vult*
to the indictment and expose himself to the very sentence his
accomplices received when their pleas were accepted, namely,
life imprisonment. By not making such an offer, Taylor
withheld from the court the opportunity to decide whether to
accept a plea of *non vult* from him. On the whole, the criti-
cized sections of the crimes act represent a humane procedural
device for the determination and administration of punish-
ment after guilt has been established either by verdict or plea.

Since Taylor did not plead *non vult,* he cannot urge
that if he had made such a plea it might have been made in
order to avoid exposure to greater punishment, death or life
imprisonment, at the hands of a jury. The possibility that his
sentence might have been less than life imprisonment if he
had pleaded *non vult,* cannot give him the standing that one
who did plead *non vult* would have to urge that he did so
rather than risk the possibility of more severe punishment.
Suppose Taylor had pleaded *non vult* and we were to declare
the second paragraph of *N. J. S.* 2A:113–3 invalid for the
reason he urges. It would simply mean that no such plea
could be accepted and, therefore, all murder cases would have
to go to trial. As a consequence, we see no merit in this
ground of appeal.

## IX.

Taylor presents 18 other alleged trial errors and argues
them in rather summary fashion in his brief. There is no
need to discuss them individually. We have studied each of
them and find no such substance as would in justice call for a
new trial.

## X.

 Taylor contends the trial judge should have disqualified himself on the motion for new trial based on the recantation of Sullivan and Aiken. There is no substance in the claim.

It appears that sometime after Aiken had been sent to State Prison for life, he wrote to the trial judge complaining that he had been "sold down the river" in that he was given a promise of a 5- to 7-year or a 10- to 15-year sentence if he pleaded guilty. And he asked for a reconsideration of his sentence. In answer the judge wrote he was convinced Aiken responded honestly at the time of the *non vult* plea when he said no promises had been made to him as to what his sentence would be.

Thereafter when the new trial was asked on the basis of the disavowed trial testimony, counsel for Taylor requested the court to disqualify himself under *N. J. S.* 2A:15–49 since, by his letter, he had already expressed an opinion on Aiken's credibility. In denying the motion the trial judge referred to *N. J. S.* 2A:15–49 which says that a judge is not prevented from sitting on a trial or argument "because he * * * has given his opinion on any question in controversy in the pending action in the course of previous proceedings therein." Moreover, he said he was not conscious of any bias or prejudice toward Taylor or Aiken and indicated he could sit fairly and impartially in the forthcoming hearing on the new trial motion.

In our judgment the exchange of letters with Aiken did not require the judge to recuse himself. Certainly it cannot be said that any expression contained therein about Aiken's statements when he pleaded *non vult* indicated the judge would have a closed or prejudiced mind as to Aiken's credibility at a formal hearing where testimony would be given under oath. The decision to remain in the case reflected the exercise of sound discretion.

## XI.

On the motion for new trial based on the recantation, as pointed out earlier herein, assigned counsel for Aiken appeared as a witness. At various times in the course of his testimony, for the purpose of refreshing his recollection, he referred to notes he had made about conversations with, and statements of, Aiken and to some extent, in connection with the arrangements for the *non vult* plea. Attorneys for both defendants asked leave to examine the notes. Permission was denied. The ruling was erroneous.

The rule has been established for a long time in both civil and criminal cases that whatever notes or memoranda a witness uses to refresh his recollection may be examined by opposing counsel, and used on cross-examination. *State v. Hunt*, 25 *N. J.* 514, 524, 525 (1958). This right of inspection exists in any proceeding, judicial or administrative. There is no requirement that it be a formal trial. Moreover, the rule long pre-existed the pronouncements of *Jencks v. United States*, 353 *U. S.* 657, 77 *S. Ct.* 1007, 1 *L. Ed.* 2d 1103 (1957), and *State v. Hunt, supra*. The latter cases considerably broadened the scope of the rule in criminal proceedings so that inspection may be demanded of witnesses' notes even when they have not been used to refresh recollection, so long as they are pertinent to the subjects covered by the testimony.

The refusal to permit the inspection here did not occur at the trial but on the application for the new trial. When the matter was argued before us we suggested that the prosecutor obtain the notes and permit defense counsel and this Court to examine them. It has now been intimated that since the hearing below, Aiken's attorney has closed his individual office and embarked on another professional connection. Some question has arisen whether the file and notes are available any longer.

Under the circumstances, the matter is remanded to the trial court with directions to permit defense counsel to recall Aiken's counsel and examine the notes referred to at the

hearing if they are in existence and can be located. If they are located and the further examination is conducted, the trial court should reconsider the motion for a new trial in the light of the additional testimony.

If Aiken's attorney informs the trial court and the parties the notes cannot be located, defense counsel may require his appearance for further examination on that subject. If the notes cannot be found, the matter must be determined on the basis of Mr. Kiely's recollection without them.

We shall not retain the record. In the event, however, further review is desired after the proceeding below, immediate application may be made to us to certify the trial court's ruling.

## XII.

The question of allowances may be presented to us independently after the proceeding on the remand has been concluded.

## XIII.

For the reasons expressed, we find no error in the trial of the case and accordingly affirm the convictions. With respect to the motion for new trial, however, the order is affirmed subject to the proceedings outlined with respect to further examination of counsel for Aiken, and reconsideration thereof by the trial court in light of any additional testimony thus adduced.

*For affirmance with directions*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.